## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROY A. DANIEL                :
    Fed. Reg. No: 09097-007      :
    U.S. Penitentiary, Coleman II    :
    P.O. Box 1034
    Coleman, Florida 33521,      :

ALFONSO TAYLOR          :
    Fed. Reg. No: 11797-007      :
    U.S. Penitentiary, Hazelton     :
    P.O. Box 2000                 :      Civil Action No.
    Bruceton Mills, West Virginia  26525,  :
                                   :      **CLASS ACTION COMPLAINT**

HAROLD VENABLE          :
    Fed. Reg. No: 03412-016
    Federal Correctional Institution,
    Cumberland                 :
    P.O. Box 1000
    Cumberland, Maryland 21501,    :

PERCY JETER                :
    Fed. Reg. No: 03066-000      :
    U.S. Penitentiary, McCreary    :
    P.O. Box 3000              :
    Pine Knot, Kentucky 42635,     :

ABDUS-SHAHID ALI        :
    Fed. Reg. No: 03201-000      :
    U.S. Penitentiary, Big Sandy    :
    P.O. Box 2067              :
    Inez, Kentucky 41224, and     :

WILLIAM TERRY            :
    Fed. Reg. No: 10975-007      :
    Federal Correctional Institution   :
    Gilmer                   :
    P.O. Box 6000              :
    Glenville, West Virginia 26351,   :

    On Behalf of Themselves and All   :
    Others Similarly Situated,      :

               Plaintiffs,     :

               -against-                    :

**ISAAC FULWOOD, JR.,** Chairman of the    :
United States Parole Commission,         :
     United States Parole Commission    :
     5550 Friendship Boulevard, Suite 420  :
     Chevy Chase, Maryland 20815,     :

**CRANSTON J. MITCHELL,** Commissioner :
of the United States Parole Commission,   :
     United States Parole Commission    :
     5550 Friendship Boulevard, Suite 420  :
     Chevy Chase, Maryland 20815, and   :

**PATRICIA K. CUSHWA,** Commissioner of :
the United States Parole Commission,    :
     United States Parole Commission    :
     5550 Friendship Boulevard, Suite 420  :
     Chevy Chase, Maryland 20815,     :

              **Defendants.**     :

# TABLE OF CONTENTS

Page

COMPLAINT ..................................................................................................1

    Nature of the Action ...............................................................................1

JURISDICTION .............................................................................................3

VENUE...........................................................................................................3

PARTIES ........................................................................................................3

STATEMENT OF FACTS..............................................................................5

I.     THE LAWS, REGULATIONS, POLICIES, AND PRACTICES GOVERNING
      PAROLE OF D.C. CODE INMATES SINCE 1972.........................................6

    A.    The 1972 Regulatory Framework Governing Parole Decisions for D.C.
         Code Inmates in Place at the Time of Plaintiffs' Offenses.......................6

    B.    The 1987 Parole Guidelines and the 1991 Policy Guideline Defining
         1987's Terms ......................................................................................8

    C.    The 2000 Guidelines Substantively Changed the Law.........................13

        1.    Offense Accountability...............................................................14

        2.    Program Achievement ................................................................15

        3.    Institutional Behavior ................................................................16

        4.    Circumstances Justifying Upward Departures from Guidelines Range ....16

        5.    Mitigating Factors.......................................................................17

    D.    The Commission Applied an Amalgamation of the 1987 and 2000
         Guidelines To Prisoners Whose Initial Parole Hearings Occurred Between
         August 5, 1998 and December 3, 2000. ..............................................17

    E.    This Court Has Found that the Substantive Differences Between the 2000
         Guidelines and 1987 Guidelines Caused Ex Post Facto Violations. ....................18

II.    SUBSTANTIVE DIFFERENCES BETWEEN THE 1972 REGULATIONS AND
      THE 2000 GUIDELINES................................................................................20

    A.    The 2000 Guidelines Harshly Increase Prisoners' Sentences Based on
         Offense Accountability, but the 1972 Regulations Do Not................................22

25320382\V-8

B.   In Contrast to the 1972 Regulations, the 2000 Guidelines Penalize Offenses More Harshly While Depreciating Positive Institutional Experiences..................................................................................................23

C.   The 2000 Guidelines Provide for Harsher Upward Departures from the Guidelines Than Did the 1972 Regulations............................................................26

D.   Mitigating Factors Considered under the 1972 Regulations and Ignored by the 2000 Guidelines..................................................................................27

III.   THE PRACTICAL EFFECT OF THE 2000 GUIDELINES ON PLAINTIFFS..............27

A.   Roy A. Daniel.............................................................................................27

1.   The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Daniel's Minimum Sentence for Offense Accountability..28

2.   Mr. Daniel's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations...................................30

3.   Mr. Daniel's Lack of Disciplinary Infractions Would be Rewarded More Significantly Under the 1972 Regulations...................................31

4.   The 2000 Guidelines Do Not Recognize Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Daniel's Case..................................................................................31

5.   The 2000 Guidelines Have Substantially Increased Mr. Daniel's Incarceration..................................................................................32

B.   Alfonso Taylor.............................................................................................32

1.   The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Taylor's Minimum Sentence for Offense Accountability..33

2.   Mr. Taylor's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations...................................36

3.   The Defendants Applied The 2000 Guidelines to Punish Mr. Taylor for His Disciplinary Infractions More Harshly Than the Governing 1972 Regulations Permit..........................................................................37

4.   Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Taylor's Case Go Unrecognized Under the 2000 Guidelines ..................................................................................38

C.   Harold Venable.............................................................................................38

1.   The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Venable's Minimum Sentence for Offense Accountability 38

2.   Mr. Venable's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations ....................................... 40

3.   The 2000 Guidelines Punish Mr. Venable for His Disciplinary Infractions More Harshly than Would the 1972 Regulations ..................................... 41

4.   Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Venable's Case Go Unrecognized Under the 2000 Guidelines ................................................................................................ 42

D.   Percy Jeter .................................................................................................... 43

1.   The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Jeter's Minimum Sentence for Offense Accountability ..... 44

2.   Mr. Jeter's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations .................................................. 47

3.   The 2000 Guidelines Punish Mr. Jeter for His Disciplinary Infractions More Harshly than Would the 1972 Regulations ..................................... 48

4.   Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Jeter's Case Go Unrecognized Under the 2000 Guidelines ................................................................................................ 49

E.   Abdus-Shahid Ali ......................................................................................... 49

1.   The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Ali's Minimum Sentence for Offense Accountability ....... 50

2.   Mr. Ali's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations .................................................. 53

3.   The 1972 Regulations would Reward Mr. Ali's Lack of Disciplinary Infractions More Significantly than the 2000 Guidelines ........................ 54

4.   Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Ali's Case Go Unrecognized Under the 2000 Guidelines . 54

F.   Plaintiff William Terry ................................................................................ 55

1.   The Commission Used the 2000 Guidelines Retroactively to Substantially Increase Mr. Terry's Minimum Sentence for Offense Accountability ...... 55

i.   The Defendants Applied the Amalgamated Guidelines at Mr. Terry's Initial Hearing ............................................................................ 56

25320382\V-8

ii.    The Defendants Applied the 2000 Guidelines at Mr. Terry's
Second and Third Hearings .................................................................56

2.    Mr. Terry's Positive Institutional Experiences and Efforts Would be
Rewarded More Significantly Under the 1972 Regulations.....................58

3.    The 2000 Guidelines Do Not Give Mr. Terry Credit for His Disciplinary
Record..................................................................................................59

4.    Specifically Enumerated Mitigating Factors from the 1972 Regulations
Present in Mr. Terry's Case Go Unrecognized Under the 2000 Guidelines
..............................................................................................................59

CLASS ACTION ALLEGATIONS............................................................................60

CLAIMS FOR RELIEF.............................................................................................62

COUNT I:  THE DEFENDANTS VIOLATED THE EX POST FACTO CLAUSE
OF THE UNITED STATES CONSTITUTION .................................62

COUNT II:  VIOLATION OF THE PLAINTIFFS' FIFTH AMENDMENT AND
FOURTEENTH AMENDMENT DUE PROCESS RIGHTS ..............64

RELIEF REQUESTED ..............................................................................................65

## COMPLAINT

Roy A. Daniel, Alfonso Taylor, Harold Venable, Percy Jeter, Abdus-Shahid Ali and

William Terry,  on behalf of themselves and on behalf of a class of all persons currently

incarcerated in federal prisons following convictions for violations of the District of Columbia

Code ("D.C. Code") committed before March 3, 1985, and who first had, or will have, their

initial parole hearings on or after August 5, 1998 (collectively, the "Plaintiffs"), by their

undersigned attorneys Sonnenschein Nath & Rosenthal LLP and the Washington Lawyer's

Committee for Civil Rights and Urban Affairs, for their Class Action Complaint state as follows:

### NATURE OF THE ACTION

1.      This is a civil class action brought to stop the Chairman and Commissioners of the

United States Parole Commission (collectively, the "Commission" or the "Defendants") from

continuing their decade-long practice of applying, on a retroactive basis, parole guidelines that

were not in force when the Plaintiffs are alleged to have committed their offenses.  This Court

has held, in an analogous decision involving persons convicted of violations of the D.C. Code

committed on or after March 3, 1985, that applying parole guidelines issued after the

commission of an offense violates the Constitutional prohibition on passage of any Ex Post Facto

law.  Nonetheless, the Commission has persisted in applying later issued guidelines to prisoners

convicted for crimes committed before March 3, 1985.  By unconstitutionally applying ex-post

facto guidelines, the Defendants (and their predecessors) have repeatedly and improperly denied

the Plaintiffs' requests for parole, and continue to do so.

2.      The Plaintiffs in this case, often as young men, are alleged to have committed

offenses against the District of Columbia on or before March 3, 1985 and were convicted and

sentenced for their offenses.  Each has been serving his sentence for decades since.  Many have

substantially rehabilitated themselves while in prison, excelling in college-level courses,

participating in extensive counseling and collecting positive work reviews.  Many have been free of disciplinary infractions or have committed only the most minor offenses, often in the early years of their incarceration.

3.      The Plaintiffs were found guilty of committing crimes when the controlling parole regulations were the District of Columbia Rules and Regulations on Granting Parole, D.C. MUN. REGS. tit. 9 § 105.0 *et seq.* (1972).  These regulations, and the policies, procedures and practices of the District of Columbia Parole Board (the "Parole Board") when implementing them (collectively, the "1972 Regulations"), emphasized the institutional experience and the rehabilitation of the convicted person in the decision whether to grant parole.

4.      But instead of conducting the Plaintiffs' parole hearings pursuant to the 1972 Regulations, the Commission has systematically applied guidelines that it unilaterally adopted fifteen years after the last offense allegedly committed by any of the Plaintiffs.  These post-facto parole rules, codified at 28 C.F.R. 2.70 *et seq.* (hereinafter, the "2000 Guidelines"), constitute a wholesale repudiation of the 1972 Regulations.  Unlike the 1972 Regulations, the 2000 Guidelines purport to focus on "offense accountability" and matters that could have been, and were, accounted for in sentencing.  The 2000 Guidelines give disproportionate weight to disciplinary offenses, no matter how minor or long ago, while giving short shrift to a Plaintiff's institutional experience or any other mitigating factor.

5.      The 2000 Guidelines were meant to change the law and did.  This is not the forum to debate the wisdom of such a drastic change in the law.  But the Constitution requires that Plaintiffs' parole hearings are not the forum for applying such a drastic regulatory change.

6.      Applying the 2000 Guidelines to the named Plaintiffs and the class they represent has resulted in their continued incarceration long beyond the time they would have been restored

to freedom under the 1972 Regulations. No man or woman may be deprived of liberty in this country based on statutes or regulations not in effect when an offense was committed. The United States Parole Commission, like every other part of our government, is bound by that fundamental principle. Accordingly, the Plaintiffs respectfully request this Court to grant injunctive and declaratory relief directing the Defendants to conduct new parole hearings for all Plaintiffs using the 1972 Regulations, declaring that the application of the 2000 Guidelines to their cases violates the Constitution, and awarding attorneys fees and such other relief as the Court finds just and proper.

## JURISDICTION

7.      Plaintiffs seek to vindicate rights protected by the Ex Post Facto Clause of Article 1, Section 9 of the United States Constitution, the Fifth Amendment to the United States Constitution, and federal law. Accordingly, this Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (a)(4), (b)(1), and 42 U.S.C. § 1983.

8.      The Court has the authority to declare the rights and obligations of the parties grant pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

9.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

10.     Plaintiffs represent and are members of a class of persons currently incarcerated in federal prisons for D.C. Code violations committed before March 3, 1985 and who had their initial parole hearing on or after August 5, 1998, or who have not yet had their initial parole hearing. The Commission has conducted parole hearings for the Plaintiffs and the class, and has announced that it intends to conduct future hearings, using the 2000 Guidelines, or variants

thereof, instead of the 1972 Regulations, which constitute the law of the District of Columbia at the time the Plaintiffs and the class members are alleged to have committed their crimes.

11.     Plaintiff Roy A. Daniel is confined at United States Penitentiary ("USP") Coleman II pursuant to a sentence imposed by the Superior Court of the District of Columbia on December 7, 1982, for an offense allegedly committed on January 6, 1982.  To clarify a discrepancy with the Parole Board's records, Mr. Daniel's name is properly spelled without an "s" (*i.e.*, his name is not "Daniels," as the Commission refers to him).

12.     Plaintiff Alfonso Taylor is confined at USP Hazelton pursuant to a sentence imposed by the Superior Court of the District of Columbia on December 11, 1980, for an allegedly offense committed on October 11, 1979.

13.     Plaintiff Harold Venable is confined at a Federal Correctional Institution in Cumberland, Maryland, pursuant to a sentence imposed by the Superior Court of the District of Columbia on June 9, 1978, for an offense allegedly committed on December 22, 1976.

14.     Plaintiff Percy Jeter is confined at USP McCreary pursuant to a sentence imposed by the Superior Court of the District of Columbia on July 22, 1987, for an offense allegedly committed on July 23, 1980.

15.     Plaintiff Christopher Turner is confined at USP Atwater pursuant to a sentence imposed by Superior Court of the District of Columbia on February 6, 1986, for an offense allegedly committed on October 1, 1984.

16.     Plaintiff Abdus-Shahid Ali is confined at USP Big Sandy, pursuant to a sentence imposed by the Superior Court of the District of Columbia on April 22, 1986, for an offense allegedly committed on February 3, 1985.

17.   Plaintiff William Terry is confined at FCI Gilmer pursuant to a sentence imposed by the Superior Court of the District of Columbia on October 29, 1979, for an offense allegedly committed on October 11, 1979.

18.   Defendant Chairman Isaac Fulwood, Jr. is the Chairman of the Commission.

19.   Defendant Cranston J. Mitchell is a Commissioner of the Commission.

20.   Defendant Patricia K. Cushwa is a Commissioner of the Commission.

21.   Defendants, as the Chairman and Commissioners of the Commission, were and remain responsible for reviewing and acting upon Plaintiffs' requests for parole in accordance with the United States Constitution and applicable laws and regulations.

## STATEMENT OF FACTS

22.   Plaintiffs are individually serving sentences imposed by the Superior Court of the District of Columbia for various violations of the District of Columbia Code. At the time that Plaintiffs allegedly committed the crimes for which they were convicted and sentenced, authority for parole decisions for D.C. Code violators rested with the District of Columbia Parole Board (the "Parole Board").

23.   On August 5, 1997, Congress enacted the National Capital Revitalization and Self-Government Improvement Act, Pub. L. No. 105-33, § 11231, 111 Stat. 712 (1997) (the "Revitalization Act").

24.   The Revitalization Act abolished the Parole Board, *see* Pub. L. No. 105-33 § 11231(b), and directed the Defendants, as the Chairman and Commissioners of the Commission, to conduct parole hearings for D.C. Code prisoners "pursuant to the parole laws and regulations of the District of Columbia." *Id.* § 11231(c).

25.     On August 5, 1998, the Commission assumed responsibility for making parole release decisions for all eligible D.C. Code felons, pursuant to the Revitalization Act. All the Class Members had or will have their initial parole hearings after this date.

26.     At the time that Plaintiffs committed their D.C. Code violations, the 1972 Regulations governed the Parole Board's parole decisions.

27.     In 2000, despite the requirement of the Revitalization Act that the Defendants apply the parole statutes, regulation, guidelines, and practices of the Parole Board, the Defendants published new parole rules, regulations, and guidelines that they deemed applicable to any D.C. Code inmate receiving an initial parole hearing after August 5, 1998 (the "2000 Guidelines"). *See* 28 C.F.R. § 2.8(a)(5).

28.     The Defendants chose to apply guidelines prepared by the Parole Board for inmates with an initial parole hearing date prior to August 5, 1998. *See* 28 C.F.R. § 2.80(a)(4). But for the Plaintiffs and the class they represent, the Defendants unilaterally chose to apply their newly promulgated 2000 Guidelines or variants thereof. *See id.* § 2.80(a)(1) & (5).

## I.      THE LAWS, REGULATIONS, POLICIES, AND PRACTICES GOVERNING PAROLE OF D.C. CODE INMATES SINCE 1972

### A.      The 1972 Regulatory Framework Governing Parole Decisions for D.C. Code Inmates in Place at the Time of Plaintiffs' Offenses

29.     Prior to March 3, 1985, when Plaintiffs committed the crimes for which they are currently incarcerated, the Parole Board administered parole proceedings for D.C. Code violators in the custody of the District of Columbia pursuant to Title 9 of the D.C. Municipal Regulations. D.C. Mun. Regs. tit. 9 § 105.0 *et seq.* (1972). The guidelines, policies, practices and procedures of the Parole Board with respect to these Municipal Regulations, together with the Regulations themselves, are collectively referred to herein as the "1972 Regulations."

- 6 -

30.   Prior to March 3, 1985, the Commission administered parole proceedings for

D.C. Code violators in the custody of the United States government but, like the Parole Board,

the Commission was required to apply the 1972 Regulations.

31.   The 1972 Regulations provide that the period a prisoner must serve before

becoming eligible for parole is the "minimum sentence." "Minimum sentence" means the

minimum sentence imposed by the court, less any good time for which the inmate is eligible.

32.   Under the 1972 Regulations, service of the minimum sentence fully satisfied the

prisoner's accountability for the offense for which he or she was convicted.

33.   The D.C. Code provided the following statutory instructions to the Parole Board

for determining whether to release on parole a prisoner who had served his or her minimum

sentence:

> Whenever it shall appear to the Board of Parole that there is a reasonable
> probability that a prisoner will live and remain at liberty without violating the law,
> that his release is not incompatible with the welfare of society, and that he has
> served the minimum sentence imposed or the prescribed portion of his sentence,
> as the case may be, the Board may authorize his release on parole upon such
> terms and conditions as the Board shall from time to time prescribe.

D.C. CODE § 24-204 (1967).

34.   The 1972 Regulations enumerate some, but not all, of the factors that the Parole

Board could consider when making parole decisions. Those factors include the following:

A.   The offense, noting the nature of the violation, mitigating or aggravating
circumstances and the activities and adjustments of the offender following arrest
if on bond or in the community under any pre-sentence type arrangement;

B.   Prior history of criminality noting the nature and pattern of any prior offenses as
they may relate to the current circumstance;

C.   Personal and social history of the offender, including such factors as his family
situation, educational development, socialization, marital history, employment
history, use of leisure time and prior military experience, if any;

D.    Physical and emotional health and/or problems which may have played a role in the individual's socialization process, and efforts made to overcome any such problems;

E.    Institutional experience, including information as to the offender's overall general adjustment, his ability to handle interpersonal relationships, his behavior responses, his planning for himself, setting meaningful goals in areas of academic schooling, vocational education or training, involvements in self-improvement activity and therapy and his utilization of available resources to overcome recognized problems. *Achievements in accomplishing goals and efforts put forth in any involvements in established programs to overcome problems are carefully evaluated;*

F.    Community resources available to assist the offender with regard to his needs and problems, which will supplement treatment and training programs begun in the institution, and be available to assist the offender to further serve in his efforts to reintegrate himself back into the community and within his family unit as a productive useful individual.

*Id.* (emphasis added).

35.    The 1972 Regulations therefore emphasize "institutional experience" as an important factor to be "carefully evaluated."

**B.    The 1987 Parole Guidelines and the 1991 Policy Guideline Defining 1987's Terms**

36.    At the time that the Plaintiffs committed their violations of the D.C. Code, and when they were convicted for such violations, the 1972 Regulations governed parole decisions for D.C. Code violators.

37.    In 1985, the Parole Board created and began applying regulations intended to achieve uniform application of the criteria for release on parole called for under the 1972 Regulations.  These regulations were formally adopted in 1987 at D.C. Mun. Regs. tit. 28 §§ 100 *et seq.* (1987) (repealed Aug. 5, 2000) (hereinafter the "1987 Guidelines"). The 1987 Guidelines articulated the practices, policies and procedures of the Parole Board under the 1972 Regulations.

38.    The 1987 Guidelines required the Parole Board to calculate a Salient Factor Score ("SFS") for each prisoner based on static pre-incarceration factors only.  Using the parole

applicant's SFS, the Parole Board next calculated a "Total Point Score," using both pre- and post-incarceration factors, with special consideration for programming, work and compliance with prison rules. The Parole Board based its decision to grant or deny parole on the Total Point Score. In delineated and limited "unusual circumstances" when mitigating or countervailing factors were present, the Parole Board could depart from the result otherwise dictated by a prisoner's Total Point Score.

39.     To ensure consistent and equitable application of the 1987 Guidelines and other parole regulations, in 1991 the Parole Board adopted a policy guideline defining the terms used in the 1987 guidelines (the "1991 Policy Guideline"). The 1991 Policy Guideline applied to all requests for parole heard by the Parole Board.

40.     For an initial parole hearing, the 1987 Guidelines direct that:

> After determining an adult parole candidate's SFS score and after applying the pre and post incarceration factors to arrive at a total point score pursuant to §204 and Appendix 2-1, the Board shall take one (1) of the following actions:
>
> (a)  IF POINTS = 0:   Parole shall be granted at initial hearing with low level of supervision required;
>
> (b)  IF POINTS = 1:   Parole shall be granted at an initial hearing with high level of supervision required;
>
> (c)  IF POINTS = 2:   Parole shall be granted at initial hearing with highest level of supervision required; or
>
> (c)  IF POINTS = 3-5: Parole shall be denied at initial hearing and rehearing scheduled.

41.     In the case of a parole re-hearing, the 1987 Guidelines direct that:

> In determining whether to release on parole an adult or a youth offender appearing before the Board at a parole hearing, the Board shall take the total point score from the initial hearing and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2. The Board shall then take one of the following actions:

      (a)  IF POINTS = 0-3:  Parole shall be granted at this rehearing with highest level o[f] supervision required; or

      (b)  IF POINTS = 4-5:  Parole shall be denied and a rehearing date scheduled.

42.     The manner in which the "institutional record of the candidate" is used to adjust the total point score from the initial hearing, as required by section 204.21 of the D.C. Code of Municipal Regulations, also is the subject of guidelines adopted by the Parole Board.  D.C. Mum. Regs. Tit. 28 § 204.21.  The adjustment is calculated according to the "point grid" provided in Appendices 2-1 and 2-2 to those regulations.  Appendix 2-1 is used to calculate an inmate's SFS and total point score at the initial parole hearing, and Appendix 2-2 is used to calculate an inmate's SFS and total point score at a parole rehearing.

43.     Appendices 2-1 and 2-2 to the 1987 Guidelines provide that one point can be added to an inmate's total point score for "negative institutional behavior."

44.     In section VI.A.1 of the 1991 Policy Guideline, the Parole Board defined the types of institutional disciplinary actions that would qualify as "negative institutional behavior":

1.     Negative Institutional Behavior consists of serious or repeated major disciplinary infractions, as described below, that are sanctioned under Department of Corrections due process procedures.

     a.    In INITIAL PAROLE CONSIDERATION cases, the following disciplinary infractions shall ordinarily be considered as negative institutional behavior:

         (1)  One Class I Offense for murder, manslaughter, kidnapping, armed robbery or first degree burglary at any time during the minimum sentence (see DCMR 28-502.3, May 1987); OR

         (2)  One Class I Offense . . . during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; OR

         (3)  Two Class II Offenses  . . . during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer.

- 10 -

   b.   In PAROLE RECONSIDERATION cases, the following disciplinary
        infractions occurring since the preceding release consideration on the
        sentence shall ordinarily be considered as negative institutional behavior:

        (1)   One Class I Offense (see DCMR 28-502.3 through 502.17, May
              1987); OR

        (2)   Two Class II Offenses (see DCMR 28-503.2 through 503.12, May
              1987).

45.   Appendices 2-1 and 2-2 provide that one point can be subtracted from an inmate's

total point score for "Program Achievement" (referred to in the 1991 Policy Guidelines as

"sustained program or work assignment achievement").

46.   For purposes of initial parole hearings, Section VI(A)(2)(a) of the 1991 Policy

Guideline defines "sustained program or work assignment achievement" as:

        In INITIAL PAROLE CONSIDERATION cases, the following
        accomplishments shall ordinarily be considered as sustained program or work
        assignment achievement during the period of incarceration:

        (1)   Successful completion of one or two educational or vocational
              programs, or program levels, each of which enabled the offender to
              develop an academic or job-related skill, OR enabled the offender to
              progress to a higher level of difficulty or skill in the program area.

47.   For purposes of parole rehearings, Section VI(A)(2)(b) of the 1991 Policy

Guideline defines "sustained program or work assignment achievement" as:

        In PAROLE RECONSIDERATION cases, the accomplishments
        set forth in Section VI-A-2(a) of this policy shall ordinarily be
        considered as sustained program or work assignment achievement
        where completion occurred since the preceding consideration for
        release on the sentence.

48.   The "negative institutional behavior" factor corresponds to the following finding

required by Appendices 2-1 and 2-2:

        Has this offender committed serious infractions (adjudicated under
        Department of Corrections due process procedures)?

49. The "program achievement" factor corresponds to the following finding required by Appendices 2-1 and 2-2:

> Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignments during this period of incarceration?

50. As noted above, the Parole Board could depart from the result dictated by sections 203.19 and 204.21 only in specific "unusual circumstances" and by following particular procedures. Any parole release decision falling outside the numerically determined guidelines has to be explained by reference to the specific aggravating or mitigating factors stated in Appendices 2-1 and 2-2:

> The Board may, in unusual circumstances, waive the SFS and pre and post incarceration factors [which comprise the total point score] set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

Section 204.22 of the District of Columbia Municipal Regulations.

51. The same regulations also contain a policy at section 103.2 which ensures rehearings for prisoners as follows: "A prisoner serving a maximum sentence of five (5) years or more who was denied parole at the original hearing ordinarily shall receive a rehearing one (1) year after the last action taken by the board." The Parole Board used this same policy under the 1972 Regulations.

52. In the 1991 Policy Guideline, the Parole Board further defined the scope of its authority to deny parole for "unusual circumstances" when a point score indicates that parole should be granted. Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," defines the following to constitute "unusual circumstances" countervailing a grant of parole:

- 12 -

a.   Repeated Failure Under Parole Supervision:

b.   Ongoing Criminal Behavior;

c.   Lengthy History of Criminally-Related Alcohol Abuse;

d.   History of Repetitive Sophisticated Criminal Behavior;

e.   Unusually Extensive or Serious Prior record;

f.   Instant Offense Involved Unusual Cruelty to Victims, which applied where the offense involved physical, mental, or emotional abuse beyond the degree needed to sustain a conviction on the instant offense or especially vulnerable victims such as children or elderly persons; and

g.   Repeated or Extremely Serious Negative Institutional Behavior.

53.   The Parole Board further defined these "unusual circumstances" in the 1991 Policy Guideline and established objective criteria to determine their applicability.

**C.    The 2000 Guidelines Substantively Changed the Law**

54.   Under the 2000 Guidelines adopted by the Commission, a D.C. Code Offender is still considered eligible for parole after service of the minimum sentence determined by the trial court. Service of the minimum sentence thus no longer satisfies "offense accountability." Instead, the 2000 Guidelines permit the Commission to deny parole based on offense accountability. The Commission has systematically denied requests for parole by the Plaintiffs and class members on the basis that they have not been incarcerated long enough to be held accountable for their offenses.

55.   In addition, the 2000 Guidelines do not give the same credit to prisoners for rehabilitative efforts in programming and work assignments as the 1972 Regulations and 1987 Guidelines.

56.   The 2000 Guidelines place greater weight on disciplinary infractions than the 1972 Regulations and 1987 Guidelines.

### 1.   Offense Accountability

57.     Chapters 1 through 12 of § 2.20 of the 2000 Guidelines contain instructions for rating certain offenses, called the "offense severity index" to account for the nature and circumstances of parole applicants' offenses and the history and characteristics of the prisoners.

58.     The "offense severity index" prevents an offender who committed a "crime of violence," as defined by the 2000 Guidelines, from being found suitable for parole at the initial parole hearing, even after he or she has served the minimum sentence.

59.     The 2000 Guidelines require the Commission to determine an SFS for each parole applicant.  The SFS is based upon pre-incarceration, static factors: prior convictions/adjudications, prior commitments of more than 30 days, age at current offense/prior commitments, recent commitment-free period, probation/parole/confinement/escape status at the time of the current offense, and the age of the offender.  The 2000 Guidelines also allow the Commission to "take into account any substantial information available to it in establishing a prisoner's offense severity rating, salient factor score, and any aggravating or mitigating circumstances, provided the prisoner is apprised of the information and afforded an opportunity to respond."

60.     Under the 2000 Guidelines, the SFS becomes a part of a Base Point Score which is comprised of three categories in which points are assigned according to the following factors:

> Category I -- Risk of Recidivism (Based on Salient Factor Score)
> Category II -- Current or Prior Violence
> Category III -- Death of a Victim or High Level of Violence

61.     The Commission uses the SFS as the basis for increasing the period of imprisonment that an inmate must serve to demonstrate parole eligibility, which effectively lengthens the minimum sentence.  In contrast, the 1972 Regulations, articulated in the 1987

Guidelines, presume parole eligibility after completion of the minimum sentence (less good time) with release subject to the inmate's post-conviction behavior.

62.     Under the 2000 Guidelines, the Commission determines parole suitability by applying the Base Point Score (the combination of points assigned from Categories I-III) to the appropriate category of offense behavior, then *adding the corresponding number of months to a parole applicant's minimum sentence* (the number of months an inmate must serve before becoming eligible for parole), based on the offense severity index.  The months added to the parole applicant's parole eligibility date based on the Base Point Score are considered to be the "Base Guideline Range," and are used by the Commission and its designees to determine the additional months of imprisonment that the inmate must serve above the months that the sentencing court required for parole eligibility.

## 2.     Program Achievement

63.     Pursuant to section 2.80(e)(1) of the 2000 Guidelines, the Commission "shall assess whether the prisoner has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense."  Under this structure, the Commission has sole discretion to determine whether the parole applicant's work and program achievements are to be considered "superior" or "ordinary."  The 2000 Guidelines instruct that "if superior achievement is found, the award for superior program achievement shall be one-third of the number of months during which the prisoner demonstrated superior program achievement."  The 1972 Regulations do not limit the Board's ability to reward a person's positive institutional experience and do not require that an offender's programming experience be "superior."

64.     The 2000 Guidelines minimize an offender's rehabilitative efforts, thereby discouraging improvements in areas identified in the 1972 Regulations.  *See* D.C. Mun. Regs. tit.

- 15 -

9 § 105.1(e) (listing, *inter alia*, the offender's overall adjustment, ability to handle interpersonal

relationships, behavior responses, personal planning, goal-setting in academic schooling,

training, and general involvements in self-improvement activity).

### 3.      Institutional Behavior

65.      Unlike the 1987 Guidelines and the 1972 Regulations, the 2000 Guidelines

automatically allocate a range of months that the Commission adds to an inmate's minimum

sentence under the provisions of 28 C.F.R. § 2.36 "for any significant disciplinary infraction

since the beginning of confinement on the current offense in the case of an initial hearing, and

since the last hearing in the case of a rehearing." 28 C.F.R. § 2.8(j).

66.      Unlike the 1987 Guidelines, which articulated the practices under the 1972

Regulations, 28 C.F.R. §§ 2.80(j) and 2.36 do not limit consideration at initial parole hearings of

negative institutional behavior to the three year period prior to the parole hearing.

### 4.      Circumstances Justifying Upward Departures from Guidelines Range

67.      The 2000 Guidelines provide that in "unusual circumstances," the Commission

may "grant or deny parole to a prisoner notwithstanding the guidelines."

> Unusual circumstances are case-specific factors that are not fully taken
> into account in the guidelines, and that are relevant to the grant or denial
> of parole. In such cases, the Commission shall specify in the notice of
> action the specific factors that it relied on in departing from the applicable
> guideline or guideline range. If the prisoner is deemed to be a poorer or
> more serious risk than the guidelines indicate, the Commission shall
> determine what Base Point Score would more appropriately fit the
> prisoner's case, and shall render its initial and rehearing decisions as if the
> prisoner had that higher Base Point Score. It is to be noted that, in some
> cases, an extreme level of risk presented by the prisoner may make it
> inappropriate for the Commission to contemplate a parole at any hearing
> without a significant change in the prisoner's circumstances.

28 C.F.R. § 2.80(n)(1).

68.    The 2000 Guidelines do not limit what may qualify as "unusual circumstances." 28 C.F.R. § 2.80(n) defines "unusual circumstances" for purposes of the 2000 Guidelines and provides examples, but does not adopt the definitions and implementation practices of "unusual circumstances" that the Parole Board adopted in the 1991 Guideline, as outlined above.

### 5.    Mitigating Factors

69.    Under the 2000 Guidelines, the "Total Guidelines Range" (the ultimate determination of time to be served to establish presumptive suitability for parole pursuant to the Commission's guideline structure) is calculated by adding "the minimum of the base point guideline range, the number of months required by the prisoner's parole eligibility date, and the minimum of the guideline range for disciplinary infractions, if applicable." Mitigating factors are only taken into account by departing from the Total Guidelines Range. The Commission almost never makes such a departure. The consequence is that, unlike the 1972 Regulations, mitigating factors are effectively not accounted for under the 2000 Guidelines.

70.    The 2000 Guidelines provide for factors that "may warrant a decision below the guidelines." But these factors do not encompass many of the factors required to be considered as mitigating under the 1972 Regulations, and in practice the Defendants ignore mitigating factors when applying the 2000 Guidelines.

71.    The 2000 Guidelines add significant time to the minimum sentence before a person will be considered parole eligible.

### D.    The Commission Applied an Amalgamation of the 1987 and 2000 Guidelines To Prisoners Whose Initial Parole Hearings Occurred Between August 5, 1998 and December 3, 2000.

72.    Further compounding the arbitrariness of the Commission's application of its own post-facto guidelines to the Plaintiffs and the class, the Commission applied an ad-hoc, non-uniform combination of the 1987 and 2000 Guidelines to Plaintiffs and class members who had

- 17 -

their initial parole hearing in the period between August 5, 1998 and December 3, 2000, including Mr. Terry. We refer to the guidelines used in this period as the "Amalgamated Guidelines."

73. Like the 2000 Guidelines, the Amalgamated Guidelines substantively depart from the 1972 Regulations.

74. Like the application of 2000 Guidelines, application of the Amalgamated Guidelines resulted in a substantial increase in the likelihood that Plaintiffs would remain incarcerated for a longer period of time.

75. Thus in disregard of the statutes, regulations, guidelines, policies, and practices in effect when a Plaintiff or class member committed a crime and was sentenced, eligibility for parole has hinged arbitrarily upon the date when the initial parole hearing was conducted.

**E.   This Court Has Found that the Substantive Differences Between the 2000 Guidelines and 1987 Guidelines Caused Ex Post Facto Violations.**

76. This Court has found the 2000 Guidelines to be more stringent than the 1987 Guidelines. This Court has found that the practical effect of applying the 2000 Guidelines instead of the 1987 Guidelines was to subject DC Code offenders to a significant risk of substantially lengthened periods of incarceration. *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 99-100 (D.D.C. 2008). The 1987 Guidelines articulated the 1972 Regulations as applied by the Parole Board.

77. In *Sellmon v. Reilly*, the District Court for the District of Columbia held that retroactive application of the 2000 Guidelines to prisoners who committed offenses while the 1987 Guidelines were in effect established a *prima facie* case of Ex Post Facto violations, because they faced substantially increased risk of longer incarceration. 551 F. Supp. at 87.

- 18 -

78.     First, this Court found that "under the 2000 Guidelines, an offender who has committed a crime of violence resulting in the death of the victim can *never* be found suitable for parole at the time they first become eligible for parole after having serviced their minimum sentence." *Id.* at 87.

79.     This Court explained that:

> Unlike the 1987 Regulations, which add only 1 point to a candidates' SFS if his current or past offenses involved violence, weapons, and/or drug trafficking, the 2000 Guidelines treat [these characteristics] . . . as separate factors for which the USPC may award up to 7 points.  Because of this change in how 'risk' is evaluated, any offender convicted of a crime of violence resulting in the death of a victim (which includes most of the 2000 Plaintiffs) . . . will be required to serve *at least* 18 to 24 additional months [and even as much as 54-72 months] before being considered for parole.

*Id.*

80.     Second, this Court found that "the 2000 Guidelines penalize an offender more harshly for negative institutional behavior" than do the 1987 Guidelines.  *Id.*

81.     "Under the 2000 Guidelines, institutional disciplinary reports are used to add a range of months to the period that a candidate must serve to be presumed eligible for parole . . . . Therefore, in contrast to the 1987 Regulations, under the 2000 Guidelines, disciplinary infractions translate directly into additional months of incarceration." *Id.*

82.     Further, the "2000 Guidelines permit the USPC to consider *all* disciplinary infractions [as opposed to ones committed recently under the 1987 and 1972 Regulations], thus permitting for the addition of months of incarceration for offenses that the Board should not have previously considered." *Id.* at 87-88.

83.     Third, the Court found that "the 2000 Guidelines limit the impact of an offender's rehabilitative efforts." *Id.* at 88.  While the 1987 Guidelines rewarded mere *completion* of "vocational programs or short term special needs programs; achievement of a GED or higher

educational degree; or successful participation in one or more work details for at least 1/3 of the period of incarceration." *Id.* Under the 2000 Guidelines, in contrast, "only a finding of *superior* program achievement (as determined subjectively by the Hearing Examiners and Commissioners) results in reduction of the offender's total guideline range by 1/3 of the period for which such achievement is demonstrated. *Id.*

84.     Fourth, the Court found that "the 2000 Guidelines, unlike the 1987 Regulations, explicitly permit the USPC to consider offense accountability when determining whether a candidate is suitable for parole." *Id.* In contrast, the "1987 Regulations presume that the minimum sentence imposed by the sentencing court appropriately accounts for a parole candidate's offense severity and accountability and that the parole decision should be limited to consideration of the offender's risk of recidivism and institutional conduct." *Id.*

85.     Fifth, the Court found that "the 2000 Guidelines do not contain any formal criteria for determining whether a particular circumstance is 'unusual' enough to warrant a departure from an offender's point score." *Id.* at 87. "Under the 2000 Guidelines, defendants may treat as 'unusual' any circumstances not already accounted for in the total guideline range, thus substantially enlarging the USPC's discretion to impose a non-guidelines decision." *Id.*

86.     Accordingly, the Court held that the "2000 Plaintiffs have therefore made out a *prima facie* case that their *ex post facto* rights have been violated under the new regime." *Id.* at 88-89.

**II.     SUBSTANTIVE DIFFERENCES BETWEEN THE 1972 REGULATIONS AND THE 2000 GUIDELINES**

87.     Critical substantive differences between the 1972 Regulations and the 2000 Guidelines result in the constitutional violations complained of herein.

88.     First, the 2000 Guidelines automatically and retroactively increase a violent offender's minimum sentence for offense accountability. It is impossible for a class member convicted of a crime of violence resulting in the death of the victim to be found suitable for parole at the initial hearing, even after having fully served his minimum sentence. Thus, a class member who is evaluated under the 2000 Guidelines, but should have been evaluated under the 1972 Regulations, bears a significant risk of a longer period of incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

89.     Second, the 1972 Regulations give greater weight to the "institutional experience" factor than do the 2000 Guidelines. Thus, a class member who is evaluated under the 2000 Guidelines, but should have been evaluated under the 1972 Regulations, bears a significant risk of a longer period of incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

90.     Third, the 2000 Guidelines weigh disciplinary infractions more harshly than the 1972 Regulations and 1987 Guidelines. Thus, a class member who is evaluated under the 2000 Guidelines, but should have been evaluated under the 1972 Regulations, bears a significant risk of a longer period of incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

91.     Fourth, the 2000 Guidelines do not incorporate the 1972 Regulations' and 1987 Guidelines' criteria on what circumstances are unusual enough to warrant a departure from an offender's point score. Thus, a class member who is evaluated under the 2000 Guidelines, but should have been evaluated under the 1972 Regulations, bears a significant risk of a longer period of incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

92.    Fifth, the 1972 Regulations consider the internal and external problems and difficulties that might have causally contributed to the commission of an offense, as well as any efforts by the parole applicant to overcome such problems and difficulties. These factors are not considered under the 2000 Guidelines. Thus, a class member who is evaluated under the 2000 Guidelines, but should have been evaluated under the 1972 Regulations, faces a significant risk of a longer period of incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

A.    **The 2000 Guidelines Harshly Increase Prisoners' Sentences Based on Offense Accountability, but the 1972 Regulations Do Not**

93.    In contrast to the 1972 Regulations, under the 2000 Guidelines it is impossible for an offender convicted of a violent crime resulting in death to be found suitable for parole at the initial hearing, even after having fully served his or her minimum sentence.

94.    Under the 1972 regulations, a class member convicted of a violent offense could be paroled immediately after service of his minimum sentence. Under the 2000 Guidelines, that class member is presumed non-suitable for parole until he or she has served a substantial additional period of time.

95.    Unlike the 1972 Regulations, the 2000 Guidelines treat a parole candidate's history of violence, or use of a weapon or death of a victim in the underlying offense, as separate factors for which the Commission may award up to seven additional points.

96.    The 2000 Guidelines have three "risk categories" that are added together to get the offender's Base Point Score, which is used in conjunction with a grid to determine an offender's Base Point Score Guidelines Range.

97.     Category I takes an offender's SFS, which assesses recidivism risk by considering, *inter alia*, prior offenses, and assigns a numerical value termed the "contribution" from SFS, which is then added to categories II and III.

98.     Category II considers the following factors and adds points to an offender's Base Point Score accordingly:

> **+4 Points:**  Violence in current offense and any felony violence in two or more prior offenses.
> **+3 Points:**  Violence in current offense and any felony violence in one prior offense.
> **+2 Points:**  Violence in current offense.
> **+2 Points:**  Possession of firearm in current offense if current offense is not scored as a crime of violence.
> **+1 Point:**   No violence in current offense and any felony violence in one prior offense.

99.     Category III considers the death of a victim or, again, the severity of the violence, adding points to the Base Point Score accordingly:

> **+3 Points:**  Current offense was high level or other violence with death of victim resulting.
> **+2 Points:**  Current offense involved attempted murder or violence in which death of a victim would have been probable result.
> **+1 Point:**   Current offense was other high level violence.

100.    This regime substantially departs from how recidivism risk is evaluated under the 1972 Regulations.  Under the new regime, any class member convicted of a crime of violence resulting in the death of a victim will receive at least five points and will be required to serve at least a year and a half to two years of time beyond their minimum sentence before being considered for parole.

**B.     In Contrast to the 1972 Regulations, the 2000 Guidelines Penalize Offenses More Harshly While Depreciating Positive Institutional Experiences**

101.    The 2000 Guidelines penalize an offender more harshly for negative institutional behavior than the 1972 Regulations.  Under the 2000 Guidelines, institutional disciplinary

reports are used to add a range of months to the period that a candidate must serve to be presumed eligible for parole.  In contrast to the 1972 Regulations, therefore, under the 2000 Guidelines disciplinary infractions translate *directly* into additional months of incarceration.

102.    Sections 2.20 and 2.36 lay out disciplinary infractions that will result in an increased guidelines range under the 2000 Guidelines.

| Severity Rating of the New Criminal Behavior (listed in §2.20) | Guideline Range |
|---|---|
| Category One | <= 8 months |
| Category Two | <= 10 months |
| Category Three | 12-16 months |
| Category Four | 20-26 months |
| Category Five | 36-48 months |
| Category Six | 52-64 months |
| Category Seven | 64-92 months |
| Category Eight | 120 + months |

103.    Further, the 2000 Guidelines allow for the consideration of *all* disciplinary infractions, no matter how remote in time, thus permitting the Commission to add months of incarceration for offenses that the Parole Board would not have considered under the 1972 Regulations.  The 1972 Regulations, as articulated by the 1987 and 1991 Guidelines, did not consider any disciplinary infraction that occurred more than three years prior to the hearing date except where the infraction involved murder, manslaughter, kidnapping, armed robbery or first-degree burglary.

104.    Because under the 2000 Guidelines disciplinary infractions are punishable more

harshly than the 1972 Regulations and directly increase the minimum prison sentence, a class

member who is evaluated under the 2000 Guidelines, but should have been evaluated under the

1972 Regulations, bears a significant risk of a longer period of incarceration in violation of the

Ex Post Facto Clause of the United States Constitution.

105.    While negative institutional experiences are punished more harshly, positive but

not "superior" institutional experiences are not recognized under the 2000 Guidelines.  Pursuant

to section 2.80(e)(1) of the 2000 Guidelines, the Commission "shall assess whether the prisoner

has demonstrated ordinary or superior achievement in the area of prison programs, industries, or

work assignments while under confinement for the current offense."  Under this structure, the

Commissioners have *carte blanche* to decide whether a parole applicant's work and program

achievements are considered "superior" or "ordinary."  The 2000 Guidelines provide only that

"if superior achievement is found, the award for superior program achievement shall be one-third

of the number of months during which the prisoner demonstrated superior program

achievement."

106.    By contrast, under sections 105.1(c), (d) and (f) of the 1972 Regulations

rehabilitative efforts, institutional behavior, self-improvement efforts and other similar

considerations are weighted more heavily than the other 1972 Regulations parole factors.

107.    Because the 1972 Regulations give greater weight to the "institutional

experience" factor than the 2000 Guidelines, a class member evaluated for parole under the 2000

Guidelines, who should have been evaluated under the 1972 Regulations, faces a significant risk

of longer incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

**C.**     **The 2000 Guidelines Provide for Harsher Upward Departures
from the Guidelines Than Did the 1972 Regulations**

108.     The 2000 Guidelines do not limit the scenarios that may be termed "unusual

circumstances" and thereby used to justify an upward departure from an offender's guideline

range.

109.     28 C.F.R. § 2.80(n) defines "unusual circumstances" for purposes of the 2000

Guidelines and provides examples, but did not adopt the definitions and implementation

practices of "unusual circumstances" that the Parole Board adopted in the 1991 Guideline, as

described above.

110.     By contrast, under the 1972 Regulations a class member is presumptively eligible

for parole upon satisfaction of only three criteria: (a) service of the minimum sentence imposed;

(b) a determination that there is a reasonable probability that a prisoner will live and remain at

liberty without violating the law; and (c) a determination that release is not incompatible with the

welfare of society.

111.     Furthermore, under both the 1972 Regulations and the 1987 Guidelines , even if

the Board denied parole to a prisoner serving a sentence greater than five years, he would only

have to wait one more year for another opportunity at parole.  By comparison, under the 2000

Guidelines the same prisoner must wait at least three years, possibly more, for another parole

hearing even where he was already within his 2000 Guidelines range at his first hearing.

112.     Because it is far easier to justify upward departures under the 2000 Guidelines

than under the 1972 Regulations, a prisoner who is evaluated under the 2000 Guidelines, but

should have been evaluated under the 1972 Regulations, bears a significant risk of a longer

period of incarceration in violation of the Ex Post Facto Clause of the United States Constitution.

**D.     Mitigating Factors Considered under the 1972 Regulations and Ignored by the 2000 Guidelines**

113.    The 1972 Regulations emphasize the personal internal and external difficulties that might have driven a particular offender to commit a crime, as well as his efforts to overcome them.  These considerations are absent from the 2000 Guidelines.  The 2000 Guidelines focus almost exclusively on the severity of the underlying crime and the offender's criminal history. *See* 28 C.F.R. §§ 2.2, 2.8.  By doing so, the 2000 Guidelines also limit the impact of an offender's rehabilitative efforts by making no provision whatsoever for any of the criteria referenced in sections 105.1(c), (d) and (f) of the 1972 Regulations.

**III.    THE PRACTICAL EFFECT OF THE 2000 GUIDELINES ON PLAINTIFFS**

**A.     Roy A. Daniel**

114.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-113 of the Complaint as if fully set forth herein.

115.    On December 7, 1982, the Superior Court of the District of Columbia sentenced Mr. Daniel to imprisonment for a term of 30 years (360 months) to life for offenses occurring January 6, 1982: Murder I and Assault with Intent to Kill for a murder that he did not himself execute.  Significantly, the court found, and his hearing officer acknowledged, that Mr. Daniel did not pull the trigger in the murder for which he was convicted; in fact, he was not even present when the murder took place.

116.    The Defendants conducted Mr. Daniel's initial parole hearing on October 30, 2007.

117.    Despite the fact that Mr. Daniel had been convicted and sentenced at a time when the Parole Board applied the 1972 Regulations to parole determinations, Defendants or their

predecessors instructed the hearing examiner to use the Defendants' 2000 Guidelines in evaluating Mr. Daniel's request for parole.

**1.      The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Daniel's Minimum Sentence for Offense Accountability**

118.    Under the 1972 Regulations, the "minimum sentence" represented the period that an inmate needed to serve to satisfy the inmate's accountability for the offense itself.  Under the Parole Board's 1972 Regulations, Mr. Daniel had served the "minimum sentence" for his offenses when he became eligible for parole.

119.    Mr. Daniel has now been imprisoned for almost two years longer than his minimum sentence to satisfy offense accountability.  Under the 2000 Guidelines, Mr. Daniel became eligible for parole on June 24, 2008.  Under the 2000 Guidelines, he will not reach the lower end of his guideline range until he has served more than two years beyond his parole eligibility date.

120.    Defendants accomplished this significant increase in Mr. Daniel's term of imprisonment by taking his "minimum sentence" of 308 months (25 years and 7 months), calculating a Base Point Score using Mr. Daniel's offense characteristics and prior convictions, and assigning him a Base Point Score Guideline Range of 54-72 months (4.5 to 6 years) that he would have to serve, in addition to the "minimum sentence," to satisfy their view of offense accountability.

121.    Because Mr. Daniel is an offender convicted of committing a violent crime resulting in the death of the victim, under the 2000 Guidelines he could not be found suitable for parole when he first became eligible after serving his minimum sentence.

122.    However, under the 1972 Regulations, Mr. Daniel would have been eligible for parole upon the completion of his minimum sentence.  The other factors discussed below would have justified his release upon serving his minimum sentence.

123.    Mr. Daniel's 350 month (over 29 years) minimum sentence required to satisfy offense accountability under the 2000 Guidelines, as determined by the Commission at his initial parole hearing, is substantially longer than the 308 month minimum under the 1972 Regulations.  Thus, Mr. Daniel faced a three and a half year increase in his minimum sentence when the Commission applied its 2000 Guidelines instead of the 1972 Regulations.

124.    Mr. Daniel's hearing officer stated that he believes that:

> at a minimum, the subject must remain accountable within his guidelines [350 month minimum] for the Murder of Ms. Smith alone.  Likely, in the future, the Parole Commission will consider this an aggravated case and may consider the subject for an above the guideline decision in spite of his excellent institutional adjustment and the fact that he was not the trigger man [because] . . . the gun which the subject gave to his codefendant was used to kill two victims and an assault with intent to kill a third victim.  Those aggravating facts are not considered in the formulation of the subject's guidelines which would be based on one murder alone.

Thus under the 2000 Guidelines Mr. Daniel's sentence has been substantially lengthened because the hearing officer did not believe his minimum sentence adequately satisfied his minimum offense accountability.

125.    On March 16, 2010, the Commission acknowledged that it had made a mistake and that Mr. Daniel was not on probation at the time of his offense.  As a result, the Commission changed his SFS from 7 to 8, improving his recidivism risk from "good" to "very good."  The change in his SFS reduced his Base Point Score Guideline Range from 54-72 months to 36-48 months.  As a result, Mr. Daniel's Total Guideline Range was reduced from 350-368 months to 332-344 months.  Nonetheless, without explanation, at the same time the Commission delayed Mr. Daniel's parole eligibility from June 24, 2008 to July 1, 2009.

- 29 -

### 2.   Mr. Daniel's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations

126.    At his initial hearing, the Commission recognized that Mr. Daniel earned a superior program achievement award, which entitled him to a one year reduction from his Total Guideline Range.

127.    The 1972 Regulations emphasize institutional experience, specifically self-improvement activity, more heavily than do the 2000 Guidelines.   While they may not be considered "superior" program achievements under the 2000 Guidelines, Mr. Daniel has a long record of substantial and sustained achievements accrued during his period of incarceration.   His achievements would have been far more significantly rewarded under the 1972 Regulations than they have been under the 2000 Guidelines.

128.    Among others, Mr. Daniel's in-prison accomplishments include maintaining a 4.0 grade point average on a 4.0 scale at the University of the District of Columbia ("UDC") from 1990 to 1999; earning Associate Degrees in Applied Science Professional Studies in Management Technology, Applied Science Business & Public Management in Accounting Technology and an Associate in Arts in Urban Studies; earning a Bachelor of Arts in Urban Studies (summa cum laude); 28 certificates of achievement for completing self-improvement programming; nine congratulatory letters from programming authorities; and 21 character letters, including one from a Georgetown professor, vouching for Mr. Daniel's positive contributions and adjustment.

129.    These sustained and substantial accomplishments earned him only one year of credit under the 2000 Guidelines, whereas they would have been much more significantly rewarded under the 1972 Regulations, which emphasize institutional experience above all other factors.

130.    Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Daniel's offense, substantially lengthened his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 3.    Mr. Daniel's Lack of Disciplinary Infractions Would be Rewarded More Significantly Under the 1972 Regulations

131.    At his initial hearing, Mr. Daniel had *no* disciplinary infractions.  This exemplary institutional record was not recognized in any way under the 2000 Guidelines.  Being a model prisoner is rewarded under the 1972 Regulations, which prioritize a prisoner's positive adjustment while incarcerated.

132.    Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Daniel's offense, substantially lengthened his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 4.    The 2000 Guidelines Do Not Recognize Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Daniel's Case

133.    The "Hearing Summary" prepared after Mr. Daniel's initial hearing states that the "subject plans to release to DC where he will live with his family.  Case Manager Ortiz indicated that a letter of support has come in from his sister indicating that all of the family stands to help him once he is released.  This is not part of the file yet [sic] but will be forwarded to the Parole Commission Office."

134.    The 1972 Regulations explicitly provide for consideration of community resources available to assist the offender upon parole in section (f), while the 2000 Guidelines do not consider this factor at all.

135.    Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Daniel's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 5.    The 2000 Guidelines Have Substantially Increased Mr. Daniel's Incarceration

136.    The Commission calculated Mr. Daniel's Total Guideline Range as 350-368 months (29 to almost 31 years) by double-counting the nature of his crime, discounting his achievements, ignoring his perfect conduct and declining to recognize other mitigating factors in his case.  At the time of the initial hearing, Mr. Daniel had been confined for the underlying offenses for 25 years, just eight months shy of his minimum sentence under the 1972 Regulations.  Yet the Commission did not find that Mr. Daniel's case warranted a departure from the Total Guideline Range.  Accordingly, the Commission denied his parole and "Continue[d] for a reconsideration hearing in December 2011."

137.    For the foregoing reasons, the Commission's application of the 2000 Guidelines instead of the 1972 Regulations substantially lengthened Mr. Daniel's incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### B.    Alfonso Taylor

138.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-113 of the Complaint as if fully set forth herein.

139.    On December 11, 1980, the Superior Court of the District of Columbia sentenced Mr. Taylor to imprisonment for a term of 30 years to life for armed robbery, assault with intent

to kill while armed and criminal possession of a weapon without a license.  His date of offense is October 11, 1979.

140.   The Defendants conducted Mr. Taylor's initial parole hearing on May 30, 2003.

141.   Defendants conducted Mr. Taylor's second parole hearing on May 24, 2006.

142.   Defendants conducted Mr. Taylor's third parole hearing on February 3, 2009.

143.   Defendants conducted each of Mr. Taylor's hearings under the Commission's 2000 Guidelines, rather than apply the 1972 Regulations that were in effect at the time of his alleged offenses.

**1.     The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Taylor's Minimum Sentence for Offense Accountability**

144.   Because Mr. Taylor was convicted of a violent crime resulting in death, he could not have been found suitable for parole when he first became eligible after having served his minimum sentence.

145.   The 2000 Guidelines presume that Mr. Taylor is not suitable for parole until he has served a substantial additional period of time.  However, under the 1972 Regulations Mr. Taylor would have been eligible for parole upon completing his minimum sentence.  The other factors discussed below would have justified his release upon serving his minimum sentence.

146.   Mr. Taylor satisfied his minimum sentence for offense accountability on April 3, 2002.  But Mr. Taylor has served more than eight years on top of this minimum sentence because of the offense accountability provisions in the 2000 Guidelines.  Under the 2000 Guidelines, Mr. Taylor will not reach the lower end of his Guideline Range until he has served another year and a half in prison beyond his parole eligibility date.

147.   Applying the 2000 Guidelines at Mr. Taylor's initial parole hearing, Defendants took his "minimum sentence" of 271 months (22 years and 7 months), calculated a Base Point

Score using Mr. Taylor's offense characteristics and prior convictions, and assigned him a Base

Point Score Guideline Range of 110-140 months that he would have to serve, in addition to the

"minimum sentence," to satisfy offense accountability.

148.    Additionally, at Mr. Taylor's initial parole hearing, Defendants used the

Rescission Guidelines in Section 2.63 of the Commission's 2000 Guidelines to increase Mr.

Taylor's Total Guideline Range because of disciplinary infractions Mr. Taylor received while in

prison (none of which involved murder, manslaughter, kidnapping, armed robbery or first-degree

burglary). Defendants used these disciplinary infractions to calculate a Disciplinary Guideline

Range of 12-74 months that they added to Mr. Taylor's 110-140 month Base Point Score

Guideline Range and 271 months for the "Months Required to Serve to Parole Eligibility Date."

149.    Defendants observed that Mr. Taylor earned a superior program achievement

award, which entitled him to an eight month reduction from his Total Guideline Range.

150.    At Mr. Taylor's initial hearing, the Commission calculated his Total Guideline

Range as 385-477 months (32 years to almost 40 years). At the time of the initial hearing, Mr.

Taylor had been confined for the underlying offenses for almost 24 years. The Commission did

not find Taylor's case to warrant a decision outside the Total Guideline Range. Accordingly, the

Commission denied his parole and continued to a three-year Reconsideration Hearing in May

2006.

151.    Applying the 2000 Guidelines at Mr. Taylor's second parole hearing, Defendants

adjusted his prior guideline range based on any new disciplinary infractions and superior

program achievement.

152.    Defendants observed that Mr. Taylor had no additional disciplinary infractions

since his initial hearing to include in his Total Guideline Range calculation. Defendants also

- 34 -

observed that after the initial hearing Mr. Taylor had earned a superior program achievement award, entitling him to a 12 month reduction from his Total Guideline Range at his second parole hearing.

153.    At Mr. Taylor's second hearing, the Commission calculated his Total Guideline Range as 373-465 months.  At the time of the second hearing, Mr. Taylor had been confined for the underlying offenses for 26 years, 7 months.  The Commission did not find Taylor's case to warrant a decision outside the Total Guideline Range.  Accordingly, Defendants denied parole and "Continue[d] to a Three-Year Reconsideration Hearing in May 2009."

154.    Applying the 2000 Guidelines at Mr. Taylor's third parole hearing, Defendants adjusted his prior guideline range based on any new disciplinary infractions and superior program achievement.

155.    Despite Mr. Taylor's good behavior, contribution to programming and exemplary work performance reviews, Mr. Taylor was not granted a superior achievement award.

156.    Defendants used the Rescission Guidelines in Section 2.36 of the Commission's guidelines to increase Mr. Taylor's Total Guideline Range because of a disciplinary infraction Mr. Taylor had received since his second parole hearing (which did not involve murder, manslaughter, kidnapping, armed robbery or first-degree burglary).  At his third parole hearing, Defendants used this disciplinary infraction to calculate a Disciplinary Guideline Range of 0-10 months.  Defendants subtracted 20 months for the Superior Program Achievement Awards Mr. Taylor earned before his prior hearing, and added 0-10 months for the disciplinary infraction since the second hearing.

157.    Accordingly, at Mr. Taylor's third hearing the Commission calculated his Total Guideline Range as 369-471 months.  Mr. Taylor already had been confined for the underlying

- 35 -

offenses for over 29 years. The Commission did not find that Mr. Taylor's case warranted a decision outside the Total Guideline Range. Accordingly, Defendants denied parole and "Continue[d] to a Three-Year Reconsideration Hearing in February 2012."

158.    Thus, the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Taylor's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 2.    Mr. Taylor's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations

159.    The 1972 Regulations emphasize institutional experience, specifically self-improvement activity, more heavily than do the 2000 Guidelines. Mr. Taylor has a long record of substantial and sustained achievements that would have been far more significantly rewarded under the 1972 Regulations than they were under the 2000 Guidelines.

160.    Among other things, Mr. Taylor's in-prison accomplishments include no fewer than 15 certificates of achievement and accomplishment for having completed programs including Narcotics Anonymous, Alcoholics Anonymous, Introduction to Public Speaking, the CODE program and group therapy. Mr. Taylor has received multiple positive work reviews and no negative work reviews.

161.    Mr. Taylor exhibited exemplary achievement in the vocational arena as well. In 1991 Mr. Taylor was cited for his "faithful and worthwhile service on the electrical services detail." In 1997, he was named "Industrial Employee of the Year." In 1999, the general foreman at the metal fabrication, tag and sign shop at Lorton described Mr. Taylor as "an excellent worker and team leader" who required "little supervision" and was "well liked by staff and inmates alike."

162.    These sustained and substantial accomplishments earned him only 20 months credit under the 2000 Guidelines, whereas they would have been significantly recognized under the 1972 Regulations, which emphasize institutional experience and positive adjustment above all other factors.

163.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Taylor's offense, substantially increased his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 3.    The Defendants Applied The 2000 Guidelines to Punish Mr. Taylor for His Disciplinary Infractions More Harshly Than the Governing 1972 Regulations Permit

164.    Under the 1972 Regulations, Mr. Taylor's disciplinary infractions would not have increased his minimum sentence required to satisfy offense accountability because all occurred more than three years before the initial hearing and did not involve murder, manslaughter, kidnapping, armed robbery or first-degree burglary.

165.    As a result of the disparate treatment of disciplinary infractions under the 2000 Guidelines as compared to the 1972 Regulations, Mr. Taylor's *minimum* number of months to serve before eligible for parole increased by an entire year and the top of his guidelines range increased by more than six years.

166.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Taylor's offense, substantially increased his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 4.   Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Taylor's Case Go Unrecognized Under the 2000 Guidelines

167.   Mr. Taylor's relationship with his daughter, herself the mother of three, remains strong and she stands ready to help him upon his release.

168.   While this factor would have been significant under the 1972 Regulations, it was not considered by the Commission.

169.   Thus, the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Taylor's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### C.   Harold Venable

170.   Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-113 of the Complaint as if fully set forth herein.

171.   On June 9, 1978, the Superior Court of the District of Columbia sentenced Mr. Venable to imprisonment for a term of 41 to 125 years for manslaughter and robbery.  His date of offense was December 22, 1976.

172.   The Defendants conducted Mr. Venable's initial parole hearing on March 18, 2008 pursuant to the Commission's 2000 Guidelines, rather than the 1972 Regulations in place at the time he committed his offenses.

### 1.   The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Venable's Minimum Sentence for Offense Accountability

173.   Because Mr. Venable was convicted of a violent crime resulting in the death of the victim, under the 2000 Guidelines he could not have been found suitable for parole at the time he first became eligible for parole after having served his minimum sentence.

174.    However, under the 1972 Regulations Mr. Venable would have been eligible for parole upon the completion of his minimum sentence. The other factors discussed below would have justified his release upon serving his minimum sentence.

175.    Mr. Venable has already served a sentence 18 months beyond his parole eligibility date. Under the 2000 Guidelines, he will not reach the lower end of his Guideline Range until he has served another 16 months beyond his parole eligibility date.

176.    Defendants then took his "minimum sentence" of 370 months (30 years 10 months), calculated a total Base Point Score using Mr. Venable's offense characteristics and prior convictions, and assigned him a Base Point Score Guideline Range of 72-96 months (6 to 8 years) that he would have to serve, in addition to the "minimum sentence," to satisfy offense accountability.

177.    Defendants observed that Mr. Venable earned numerous superior program achievement awards, but found that these awards entitled him to only a 40 month reduction from the bottom and top of his Total Guideline Range.

178.    Additionally, at Mr. Venable's initial parole hearing, Defendants applied the Rescission Guidelines in Section 2.36 of the Commission's 2000 Guidelines to increase Mr. Venable's Total Guideline Range because of disciplinary infractions Mr. Venable received while in prison (none involving murder, manslaughter, kidnapping, armed robbery or first-degree burglary). Defendants used these disciplinary infractions to calculate a Disciplinary Guideline Range of 12-28 months that they added to Mr. Venable's 72-96 month Base Point Score Guideline Range and 370 months he is required to serve before his parole eligibility date.

179.    The Commission calculated Mr. Venable's Total Guideline Range as 414-454 months (34 ½ years to almost 38 years). At the time of the initial hearing, Mr. Venable had been

confined for the underlying offenses for 363 months, over 30 years. The Commission did not

find that Mr. Venable's case warranted a decision outside the Total Guideline Range.

Accordingly, the Commission denied him parole and "Continue[d] to a Three-Year

Reconsideration Hearing in March 2011."

180.    Accordingly, to satisfy the Commission's notion of "offense accountability"

under the 2000 Guidelines, Mr. Venable has now spent more than two years in prison above and

beyond what his minimum sentence required.

181.    Thus, the Defendants' application of the 2000 Guidelines, as opposed to the 1972

Regulations in place at the time of Mr. Venable's offense, substantially increased his

incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his

Fifth and Fourteenth Amendment rights to due process.

### 2.    Mr. Venable's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations

182.    The 1972 Regulations reward positive institutional experience more significantly

and punish negative institutional behavior less harshly than do the 2000 Guidelines.

183.    Mr. Venable's long record of substantial and sustained achievements would have

been far more significantly rewarded under the 1972 Regulations than they were under the 2000

Guidelines, because 1972 Regulations emphasize institutional experience, specifically self-

improvement activity, more heavily than do the 2000 Guidelines.

184.    Mr. Venable's in-prison accomplishments since 2002 alone include completion of

the Breaking Barriers course, the 40-Hour Drug Abuse Program and a 24-month Program for

Emergency Management. Mr. Venable also participated in a Vocational Training Sewing Class,

Commercial Driver's License Course and the Victim Impact Counseling Program. Finally, Mr.

Venable earned his GED with highest honors.

185.    These sustained and substantial accomplishments earned Mr. Venable only 40

months credit under the 2000 Guidelines, whereas they would have been much more

significantly rewarded under the 1972 Regulations, which emphasize institutional experience and

positive adjustment above all other factors.

186.    In addition to program achievement, Mr. Venable twice came to the defense of

corrections staff, *once being stabbed in the process.*  Mr. Venable was subject to harassment by

the other prisoners as a result of his heroism.

187.    Applying the 2000 Guidelines, the hearing examiner awarded Mr. Venable only

18 months of additional sentence reduction as a result of his actions protecting the prison

staffers.  Under the 1972 Regulations, Mr. Venable's valiant actions and wounds would be more

significantly recognized.

188.    Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations

in place at the time of Mr. Venable's offense, substantially increased his incarceration in

violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and

Fourteenth Amendment rights to due process.

**3.      The 2000 Guidelines Punish Mr. Venable for His Disciplinary
         Infractions More Harshly than Would the 1972 Regulations**

189.    The infractions on which Defendants base Mr. Venable's 12-28 month (1 year to

2 years 4 months) minimum sentence increase are as follows: (a) on September 8, 1981, Mr.

Venable admitted to possession of one marijuana cigarette and $1.25; (b) on August 19, 1982,

Mr. Venable was found to have "grabbed" a Correctional Officer; (c) on June 6, 1988, Mr.

Venable engaged in a fight, in which he claimed to have been victimized; and (d) on July 27,

2002 Mr. Venable violated phone rules by engaging in a non-criminal, three-way telephone call.

190.    Consideration of these infractions under the 2000 Guidelines substantially

increased Mr. Venable's minimum incarceration period beyond his minimum sentence under the

1972 Regulations.  The 1972 Regulations would not have considered these four minor infractions

from Mr. Venable's distant past in determining his parole eligibility decades later.

191.    Defendants used these disciplinary infractions to calculate a Disciplinary

Guideline Range of 12-28 months, which they added to Mr. Venable's 72-96 month (6 to 8 year)

Base Point Score Guideline Range and 370 months (almost 31 years) for the "Months Required

to Serve to Parole Eligibility Date."

192.    Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations

in place at the time of Mr. Venable's offense, substantially increased his incarceration in

violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and

Fourteenth Amendment rights to due process.

> **4.      Specifically Enumerated Mitigating Factors from the 1972
> Regulations Present in Mr. Venable's Case Go Unrecognized
> Under the 2000 Guidelines**

193.    Under the 1972 Regulations, the mitigating circumstances of Mr. Venable's

participation in the offense behavior would have been more heavily weighed than they were

under the 2000 Guidelines.

194.    As a child Mr. Venable lacked any significant positive male role model.  At a

young age he became involved in criminal activity encouraged and led by his uncle, who was his

only male role model.

195.    Additionally, the "Hearing Summary" for Mr. Venable's initial hearing notes that

he has a substantial network of family who have supported him throughout his incarceration and

will support him upon his release.  Mr. Venable's sister corroborated that he has always taken

full responsibility for his actions.

196.    Further, Mr. Venable has saved money from his job and supported his children throughout his incarceration.  He also has employment possibilities at Safeway and Black Supermarket upon release, and has plans to start a landscaping and cleaning business.

197.    The 1972 Regulations explicitly provide for consideration of community resources available to assist the offender upon parole, while the 2000 Guidelines do not consider that factor at all.

198.    Given the 1972 Regulations' emphasis on self-improvement activity, Mr. Venable's superior achievement would have been more significantly rewarded under the 1972 Regulations than it was under the 2000 Guidelines.

199.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Venable's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

**D.    Percy Jeter**

200.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-113 of the Complaint as if fully set forth herein.

201.    On July 22, 1987, the Superior Court of the District of Columbia sentenced Mr. Jeter to imprisonment for a term of 20 years to life for felony murder.  His date of offense was July 23, 1980.

202.    The Defendants conducted Mr. Jeter's initial parole hearing on or about April 26, 2002.

203.    Defendants conducted Mr. Jeter's second parole hearing on February 27, 2006.

204.    Defendants conducted Mr. Jeter's third parole hearing on March 18, 2009.

205.    Defendants conducted each of Mr. Jeter's hearings under the Commission's 2000 Guidelines, rather than under the applicable 1972 Regulations.

**1.    The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Jeter's Minimum Sentence for Offense Accountability**

206.    Because Mr. Jeter was convicted of a violent crime resulting in the death of the victim, under the 2000 Guidelines he could never have been found suitable for parole at the time he first became eligible for parole after having served his minimum sentence.

207.    However, under the 1972 Regulations Mr. Jeter would have been eligible for parole upon the completion of his minimum sentence. The other factors discussed below would have justified his release upon serving his minimum sentence.

208.    Instead, because the Commission has retroactively applied the offense accountability requirements of the 2000 Guidelines, Mr. Jeter has served at least 94 months -- almost eight years -- longer than his minimum sentence. Under the 2000 Guidelines, Mr. Jeter will not reach the lower end of his Guideline Range until he has served 13 years beyond his parole eligibility date.

209.    Under the 1972 Regulations, Mr. Jeter would not have been subject to the Commission's mechanical application of a 72-96 month (6 to 8 year) additional minimum sentence to satisfy offense accountability.

210.    Applying the 2000 Guidelines at Mr. Jeter's initial parole hearing, Defendants took his "minimum sentence" of 20 years, calculated a Base Point Score using Mr. Jeter's offense characteristics and prior convictions, and assigned him a Base Point Score Guideline Range of an additional 72-96 months (6 to 8 years) that he would have to serve to satisfy offense accountability.

211.    Under the 2000 Guidelines, Mr. Jeter's total Base Point Score of eight corresponds to 72-96 months on the Base Point Score Guideline chart. Using the 2000 Guidelines, the Commission mechanically applied his 72-96 month additional minimum sentence necessary to satisfy offense accountability because the 2000 Guidelines' formula determined that Mr. Jeter is a poor recidivism risk (3 points), his current offense involved violence (2 points), and his current offense involved violence with the death of a victim resulting (3 points).

212.    Additionally, at Mr. Jeter's initial parole hearing Defendants used the Rescission Guidelines in Section 2.36 of the Commission's 2000 Guidelines to increase Mr. Jeter's Total Guideline Range because of disciplinary infractions he received while in prison (none of which involved murder, manslaughter, kidnapping, armed robbery or first-degree burglary). Defendants used these disciplinary infractions to calculate a Disciplinary Guideline Range of 0-24 months that they added to his 72 to 96 month Base Point Score Guideline Range and 20 years for the "Months Required to Serve to Parole Eligibility Date."

213.    At Mr. Jeter's initial hearing, the Commission miscalculated his number of months in custody because it failed to account his jail credit. Mr. Jeter had actually been confined for the underlying offenses for a total of 237 months (19 years 9 months). This, however, did not change the Total Guideline Range calculation of 251-297 months (20 years 11 months to 24 years 9 months). The Commission did not find that Mr. Jeter's case warranted a decision outside the Total Guideline Range. Accordingly, the Commission denied parole and Mr. Jeter's case was "Continue[d] to a Three-Year Reconsideration Hearing in June 2005."

214.     Applying the 2000 Guidelines at Mr. Jeter's second parole hearing, Defendants adjusted his prior guideline range based on any new disciplinary infractions and superior program achievement.

215.     The Hearing Summary for Mr. Jeter's second hearing observed that he completed the CODE program, participated in the Literacy Program, and had positive work reviews, noting his "good performance." Mr. Jeter received no credit for these positive contributions because Defendants unilaterally determined that his conduct did not pass the 2000 Guidelines' high bar of "superior" program achievement.

216.     Defendants also noted that Mr. Jeter had one drug related infraction since his initial hearing, resulting in an additional 0-8 months added to his Base Point Score Guideline Range through the disciplinary guidelines.

217.     At Mr. Jeter's second hearing, the Commission calculated his Total Guideline Range as 312-366 months (26 years to 30 ½ years). At the time of the second hearing, Mr. Jeter had been confined for the underlying offenses for 23 years, 8 months. The Commission did not find that Mr. Jeter's case warranted a decision outside the Total Guideline Range. Accordingly, Defendants denied parole and "Continue[d] to a Three-Year Reconsideration Hearing in February 2009."

218.     Between Mr. Jeter's second and third hearings, Defendants arbitrarily recalculated Mr. Jeter's Base Point Score, adjusting it upwards to ten, without explanation.

219.     Applying the 2000 Guidelines at Mr. Jeter's third parole hearing, Defendants adjusted his prior guideline range based on any new disciplinary infractions and superior program achievement, and assigned him a Base Point Score Guideline Range of 156 to 192

months (13 to 16 *years*) that he would have to serve, in addition to the "minimum sentence," to satisfy offense accountability.

220.     Additionally, at Mr. Jeter's third parole hearing Defendants used the Rescission Guidelines in Section 2.36 of the 2000 Guidelines to increase his Total Guideline Range because of disciplinary infractions he received while in prison (none of which involved murder, manslaughter, kidnapping, armed robbery or first-degree burglary).  Defendants used these disciplinary infractions to calculate a Disciplinary Guideline Range of 0-30 months (from before the last hearing), which they added to Mr. Jeter's 159-192 Base Point Score Guideline Range and 20 years for the "Months Required to Serve to Parole Eligibility Date."  Defendants then accounted for Mr. Jeter's infractions since the last hearing and added 0-8 months to his Total Guideline Range.

221.     At Mr. Jeter's third hearing, the Commission calculated his Total Guideline Range as 396-470 months (33 to over 39 years).  At the time of the third hearing, Mr. Taylor had been confined for the underlying offenses for almost 27 years.  The Commission did not find that Jeter's case warranted a decision outside the Total Guideline Range.  Accordingly, Defendants denied parole and "Continue[d] to a Three-Year Reconsideration Hearing in March 2012."

222.     Thus the Commission's application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Jeter's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

**2.     Mr. Jeter's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations**

223.     The 1972 Regulations emphasize institutional experience, specifically self-improvement activity, more heavily than do the 2000 Guidelines.  Mr. Jeter has a long record of

substantial and sustained achievements that would have been far more significantly rewarded under the 1972 Regulations than they were under the 2000 Guidelines.

224.   Between Mr. Jeter's initial and second parole hearing, he completed the CODE program, participated in the Literacy Program and had positive work reviews, noting his "good performance." Mr. Jeter received no credit for these positive contributions because his conduct did not meet the 2000 Guidelines' high bar of "superior" program achievement. Under the 1972 Regulations, however, his efforts would have been recognized as justifying his release soon after his parole eligibility date.

225.   Given the 1972 Regulations' emphasis on institutional experience, specifically self-improvement activity, adjustment and the ability to interact well with others, Mr. Jeter's self-improvement efforts, positive progress reports and reports on his behavior at work would have been more significantly rewarded under the 1972 Regulations than they were under the 2000 Guidelines.

226.   Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Jeter's offense, substantially increased his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

**3.     The 2000 Guidelines Punish Mr. Jeter for His Disciplinary Infractions More Harshly than Would the 1972 Regulations**

227.   As a result of the disparate treatment of disciplinary infractions under the 2000 Guidelines as compared to the 1972 Regulations, Mr. Jeter's Total Guideline Range increased by more than three years.

228.   Under the 1972 Regulations, Mr. Taylor's disciplinary infractions would not have increased the minimum sentence required to satisfy offense accountability because they occurred

more than three years before his initial hearing and did not involve murder, manslaughter, kidnapping, armed robbery or first-degree burglary.

229.    As a result of the disparate treatment of disciplinary infractions under the 2000 Guidelines as compared to the 1972 Regulations, Mr. Jeter's minimum number of months to serve before becoming eligible for parole increased by an entire year.

230.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Jeter's offense, substantially increased his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

**4.      Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Jeter's Case Go Unrecognized Under the 2000 Guidelines**

231.    Under the 1972 Regulations, as opposed to under the 2000 Guidelines, the mitigating circumstances surrounding Mr. Jeter's crime and prison experience would serve to reduce his sentence.

232.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Jeter's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

**E.      Abdus-Shahid Ali**

233.    Plaintiffs repeat and re-allege the allegations set fourth in paragraphs 1-113 of the Complaint as if fully set forth herein.

234.    On April 22, 1986, the Superior Court of the District of Columbia sentenced Mr. Ali to imprisonment for a term of twenty 20 years to life for first degree murder. His date of offense was February 3, 1985.

- 49 -

235.   The Defendants conducted Mr. Ali's initial parole hearing on September 14, 2005.  That has been his only parole hearing to date.

236.   Defendants conducted Mr. Ali's initial hearing under the Commission's 2000 Guidelines, rather than apply the 1972 Regulations in place at the time of his alleged offense.

237.   Had Mr. Ali committed his offense one month later, after March 3, 1985, the Commission would consider Mr. Ali eligible for a rehearing under the 1987 Guidelines.  United States Parole Commission Regulations, 74 Fed. Reg. 218 (Nov. 13, 2009).  Because of the Defendants' arbitrary distinctions in applying the rules of parole, they have refused to grant him that rehearing.

**1.     The 2000 Guidelines Automatically, Retroactively, and Substantially Increased Mr. Ali's Minimum Sentence for Offense Accountability**

238.   Because Mr. Ali was convicted of murder, under the 2000 Guidelines he could never be found suitable for parole when he first became eligible for parole after having served his minimum sentence.

239.   However, under the 1972 Regulations, Mr. Ali would have been eligible for parole upon the completion of his minimum sentence.  The other factors discussed below would have justified his release upon serving his minimum sentence.

240.   Applying the 2000 Guidelines at Mr. Ali's initial parole hearing, Defendants took his "minimum sentence" of 251 months, calculated a Base Point Score using Mr. Ali's offense characteristics and prior convictions, and assigned him a Base Point Score Guideline Range of 110-140 additional months that he would have to serve, in addition to the "minimum sentence," to satisfy offense accountability.

241.   Under the 2000 Guidelines, Mr. Ali's total Base Point Score of nine corresponds to 110-140 months on the Base Point Score Guideline chart.  The 2000 Guidelines mechanically

applied a 110-140 month additional minimum sentence necessary to satisfy offense culpability to Mr. Ali because the formula determined that he is a "fair" recidivism risk (two points), his current offense involved violence and two prior offenses involved felony violence (four points), and his current offense involved violence with the death of a victim resulting (three points).

242.   A Hearing Examiner later determined that Mr. Ali's SFS had been miscalculated, but that the miscalculation did not change Mr. Ali's Base Point Score.

243.   Mr. Ali has no disciplinary record, so Defendants did not add months to his sentence as a result.

244.   Because the Commission improperly applied the 2000 Guidelines to his case, Mr. Ali has served over four years longer than the minimum sentence required to satisfy offense accountability.  Under the 2000 Guidelines, Mr. Ali will not reach the lower end of his Guideline Range until he has served nine years beyond his parole eligibility date.

245.   Under the 1972 Regulations, Mr. Ali would not have been subject to the mechanically applied 110-140 month (9 to almost 12 year) additional minimum sentence assigned at his initial hearing.  Instead, Mr. Ali's parole request would have been considered under factors that emphasized his institutional experience.

246.   Under the 1972 Regulations, serving the minimum sentence imposed satisfies "offense accountability."  Mr. Ali's minimum sentence was 20 years to life under the 1972 Regulations.  Under the 2000 Guidelines, however, his minimum sentence before presumptive parole eligibility exceeds 29 years.  Thus the Commission's application of the 2000 Guidelines to Mr. Ali's case will keep him in prison at least nine years longer than under the 1972 Regulations.

247.   The Commission noted the following about Mr. Ali: "He lacks 6 credits that are necessary to accomplish the Bachelor's Degree [but he had already earned his Associates Degree]. Additionally, subject has certificates for completing all five levels of Conflict Resolution. The subject has a certificate for completing a Non-Violent Workshop, and he has a Certificate of Appreciation for Volunteering his time in the Religious Program. Additionally, subject showed this examiner a program that he has written up and is recommending the [sic] implement. The program is called CHANGE."

248.   Although it noted Mr. Ali's positive contributions, which are outlined throughout this section, those contributions only earned Plaintiff a 12 month credit for "Superior Program Achievement."

249.   As a result, the Commission calculated Mr. Ali's Total Guideline Range under the 2000 Guidelines to be 349-379 months.

250.   On February 26, 2007, the Parole Commission realized that it had erred in calculating Mr. Ali's Total Guideline Range. The Commission issued a correction stating that Mr. Ali's true Total Guideline Range was 338-368 months because the Commission reduced, without explanation, his "months required to eligibility" from 251 to 240 months.

251.   At the time of the initial hearing, Mr. Ali had been confined for his underlying offenses 20 ½ years. The Commission did not find that Mr. Ali's case warranted a decision outside the Total Guideline Range. Accordingly, the hearing officer and commissioner agreed the deny parole and "Schedule for a Reconsideration Hearing in September 2010."

252.   Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Ali's offense, substantially increased his incarceration in violation of

the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 2.   Mr. Ali's Positive Institutional Experiences Would be Rewarded More Significantly Under the 1972 Regulations

253.   The 1972 Regulations emphasize institutional experience, specifically self-improvement activity, more heavily than the other factors.  Mr. Ali has been involved in and excelled at numerous education and vocational skills classes.  Mr. Ali has completed his GED, taken classes at UDC, and is working towards an associate of arts degree in business management.

254.   Among Mr. Ali's other distinctions are certificates of completion for the following programs and courses: Basic Keyboarding; Frameworks for Recovery; Group Psychotherapy; Computer Literacy; Sheet Metal Helper; Building and Trades Training Program; Anger/Stress Management Program; Adult Continuing Education; Basic Principles for Construction; English Fundamentals; and Alegebra.

255.   Mr. Ali also has a spotless disciplinary record and positive job performance reviews.  The 1972 Regulations emphasize institutional experience, specifically self-improvement activity, contribution to just community, adjustment and the ability to interact well with others.  Were the 1972 Regulations applied to Mr. Ali's case, his self-improvement efforts, positive progress reports and reports on his behavior at work would have justified his release at his presumptive eligibility date after serving his minimum sentence.

256.   The 2000 Guidelines, however, only reward "superior program achievement," so Mr. Ali's minimum sentence was only reduced by 12 months.

257.   Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Ali's offense, substantially increased his incarceration in violation of

the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth

Amendment rights to due process.

> ### 3.   The 1972 Regulations would Reward Mr. Ali's Lack of Disciplinary Infractions More Significantly than the 2000 Guidelines

258.   At his initial hearing, because Mr. Ali had no disciplinary infractions, the

Commission added no months to his Total Guideline Range for that category.   This exemplary

institutional record was not rewarded in any way under the 2000 Guidelines, but would have

been under the 1972 Regulations, which prioritize a prisoner's positive adjustment to a life of

confinement.

259.   Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations

in place at the time of Mr. Ali's offense, substantially increased his likelihood of lengthened

incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his

Fifth and Fourteenth Amendment rights to due process.

> ### 4.   Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Ali's Case Go Unrecognized Under the 2000 Guidelines

260.   Under the 1972 Regulations, as opposed to under the 2000 Guidelines, the

mitigating circumstances surrounding Mr. Ali's crime and prison experience would serve to

reduce his sentence.

261.   Thus, the application of the 2000 Guidelines, as opposed to the 1972 Regulations

in place at the time of Mr. Ali's offense, substantially increased his likelihood of lengthened

incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his

Fifth and Fourteenth Amendment rights to due process.

F.    **Plaintiff William Terry**

262.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-113 of the Complaint as if fully set forth herein.

263.    Mr. Terry had an initial parole hearing on July 19, 2000 at which he was denied parole using the Amalgamated Guidelines as described above.

264.    Mr. Terry had a second parole hearing in or about January, 2003, at which Defendants denied him parole using the 2000 Guidelines.

265.    Mr. Terry had a third parole hearing on November 21, 2007, at which he again was denied parole under the 2000 Guidelines.

1.    **The Commission Used the 2000 Guidelines Retroactively to Substantially Increase Mr. Terry's Minimum Sentence for Offense Accountability**

266.    Because Mr. Terry was convicted of a violent crime resulting in the death of the victim, under the 2000 Guidelines he could never have been found suitable for parole when he first became eligible after serving his minimum sentence.

267.    Under the 1972 Regulations, Mr. Terry would have been eligible for parole upon the completion of his minimum sentence. The other factors discussed below would have justified his release upon serving his minimum sentence.

268.    Under the 1972 Regulations, Mr. Terry would not have been subject to the mechanically applied 13 to 16 year additional minimum sentence necessary to satisfy offense culpability as he was at his initial hearing under the 2000 Guidelines. Instead, Mr. Terry would have faced different parole factors that emphasized positive behavior in the institutional experience.

269.    Instead, because the Commission unconstitutionally applied the 2000 Guidelines to Mr. Terry's case, he has served over 30 and a half years in prison -- 10 ½ years longer than his

minimum sentence under the 1972 Regulations.  Under the 2000 Guidelines, Mr. Terry will not

reach the lower end of his Guideline Range until he has served 13 years beyond his parole

eligibility date.

### i.   The Defendants Applied the Amalgamated Guidelines at Mr. Terry's Initial Hearing

270.    At Mr. Terry's initial parole hearing, the Commission applied its arbitrary

"Amalgamated Guidelines" and failed to consider all factors and information presented by Mr.

Terry.

271.    The Commission did not consider the 1972 Regulations.

272.    The Commission did not consider Mr. Terry's substantial achievements while

imprisoned, except to subtract only one point for "ordinary program achievement" under its

current, rigid formula.

273.    Taking Mr. Terry's Base Point Score of ten and adjusting his score up one for

negative institutional behavior and down one for ordinary program achievement, the

Commission arrived at a Total Point Score of ten for Mr. Terry.

274.    The Commission did not believe that "a departure from the rehearing guidelines"

was warranted.

275.    The Commission indicated that the rehearing guidelines called for a rehearing

within 26-32 months from Mr. Terry's parole eligibility date.

### ii.   The Defendants Applied the 2000 Guidelines at Mr. Terry's Second and Third Hearings

276.    Applying the 2000 Guidelines at Mr. Terry's second hearing, the Defendants took

his minimum sentence of 20 years, used the Base Point Score calculated at his initial hearing

from his offense characteristics and prior convictions, and assigned him a Base Point Score

Guideline Range of 13 to 16 years that he would have to serve, in addition to the minimum

sentence, to satisfy offense accountability.

277.    Defendants also found a 0-30 month disciplinary range from before the Initial

Hearing, and a 0-0 range for superior program achievement.

278.    Because Mr. Terry had not earned superior program achievement credits, nor

suffered disciplinary guideline range demerits since his Initial Hearing, Mr. Terry's Total

Guideline Range remained at 396-462 months to satisfy minimum offense accountability.

279.    At the time of his second parole hearing, Mr. Terry had served more than 23 years

-- well in excess of the 20 years that would have satisfied minimum offense accountability under

the 1972 Regulations.

280.    Nevertheless, the Commission found no reason to depart from the 2000

Guidelines and thus continued for a reconsideration hearing in November, 2007.

281.    Applying the 2000 Guidelines at Mr. Terry's third parole hearing, the Defendants

imported his Base Point Score of ten, which they calculated using Mr. Terry's offense

characteristics and prior convictions, and assigned him a Base Point Score Guideline Range of

156-192 months that he would have to serve, in addition to the "minimum sentence," to satisfy

offense accountability.

282.    Defendants added his Base Point Score Guideline Range to his "minimum

sentence" of 20 years.

283.    Defendants also imported his 0-30 month disciplinary range from before the

Initial Hearing and a 0-0 range for superior program achievement.

284.    Because Mr. Terry earned neither superior program achievement credits nor

disciplinary guideline range demerits since his second hearing, Mr. Terry's Total Guideline

Range remained at 396-462 months (33 to 38 ½ years) to satisfy minimum offense accountability.

285.    At the time of his third hearing, Mr. Terry had served over 28 years as his minimum offense accountability sentence, well exceeding the 20 years required to serve to parole eligibility date that would have satisfied his offense accountability under the 1972 Regulations.

286.    Nevertheless, the Commission found no reason to depart from the 2000 Guidelines, and thus continued for a reconsideration hearing in November of 2010.

287.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Terry's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 2.    Mr. Terry's Positive Institutional Experiences and Efforts Would be Rewarded More Significantly Under the 1972 Regulations

288.    Under the 1972 Regulations, Mr. Terry's accomplishments would be viewed in light of his abilities, rather than under the unbending 2000 Guidelines' "superior program achievement" standard.

289.    Mr. Terry has tried hard to obtain a GED while institutionalized.  He lacks the capacity to attain the degree, but has made valiant efforts towards obtaining it.

290.    The 1972 Regulations reward "meaningful goals" on an individualized basis and reward effort, even if that effort does not succeed.  The 2000 Guidelines do not.

291.    Mr. Terry's self-improvement activity, positive institutional experience, the ability to interact well with others, and the mitigating circumstances of his offense would have

been recognized under the 1972 Regulations. They are not recognized under the 2000 Guidelines.

292.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Terry's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 3.    The 2000 Guidelines Do Not Give Mr. Terry Credit for His Disciplinary Record

293.    Mr. Terry has a nearly spotless disciplinary record. Such an institutional record would have resulted in favorable treatment under the 1972 Regulations. The Commission has completely failed to acknowledge Mr. Terry's sterling disciplinary record when applying the 2000 Guidelines to his case.

294.    Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Terry's offense, substantially increased his likelihood of lengthened incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

### 4.    Specifically Enumerated Mitigating Factors from the 1972 Regulations Present in Mr. Terry's Case Go Unrecognized Under the 2000 Guidelines

295.    Under the 1972 Regulations, the mitigating circumstances of Mr. Terry's participation in the offense behavior would have been more heavily weighed than they were under the 2000 Guidelines.

296.    Mr. Terry believed that a man wielding a knife was trying to kill him when he turned around suddenly and shot the man in the chest, hoping to slow, not kill, his attacker.

297.     Under the 1972 Regulations, the circumstances of Mr. Terry's crime are a mitigating factor to be considered in analyzing his risk of violent recidivism.

298.     By contrast, the 2000 Guidelines not only preclude consideration of the circumstances of Mr. Terry's crime but, because his crime involved violence and death, dictate that his Guideline Range must be increased.

299.     Thus the Defendants' application of the 2000 Guidelines, as opposed to the 1972 Regulations in place at the time of Mr. Terry's offense, substantially increased his incarceration in violation of the Ex Post Facto Clause of the United States Constitution and his Fifth and Fourteenth Amendment rights to due process.

## CLASS ACTION ALLEGATIONS

300.     The named Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, on behalf of a class of persons comprised of prisoners convicted under the D.C. Code who, despite having committed the offenses for which they are currently incarcerated before March 3, 1985, have had (or will have) the 2000 Guidelines improperly applied at their parole hearings by the Defendants, instead of the 1972 Regulations, which were in place at the time of their offenses.

301.     The legal and factual claims of the named Plaintiffs are typical of all class members.  As a result of the Defendant's wrongful application of the 2000 Guidelines instead of the proper 1972 Regulations, each class member continues to suffer or will suffer longer incarceration or a significant risk of a longer period of incarceration, in violation of the Ex Post Facto clause of the United States Constitution and due process.

302.   All class members are equally subject to the conditions described in this Complaint.   Common questions of law and fact exist among all class members.   These common questions include:

    (a)   when their offenses occurred;

    (b)   the parole guidelines in place at the time of such offenses;

    (c)   the parole guidelines that were applied at the class member's initial parole hearing;

    (d)   when the initial parole hearing occurred;

    (e)   the Commission's conduct of the parole hearing;

    (f)   the parole guidelines applied in subsequent parole hearings, if any;

    (g)   how the parole guidelines actually applied compare to 1972 Regulations in place at the time of the offense; and

    (h)   whether application of the later guidelines has resulted in an increased incarceration or a substantially increased likelihood of longer incarceration.

303.   The relief sought herein -- use of the 1972 Regulations at the parole hearings of all class members, and prompt re-hearings for all class members who already have had a hearing -- is common to all members of the class.   The relief sought will apply to all class members and will serve to remediate all class members.

304.   The proposed class is so numerous that joinder of all members is impracticable. As D.C. Code prisoners, the class members are imprisoned in scattered federal facilities across the country.

305.   Plaintiffs will fairly and adequately represent the interests of the class.

306.    Plaintiffs have no interests at issue here separate from those of the class. Plaintiffs seek no relief in this action other than the relief sought on behalf of the class.

307.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent and varying adjudications that could establish incompatible standards of conduct for the Defendants.

308.    The prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members that could, as a practical matter, substantially impair the ability of the other members to protect their interests.

309.    Defendants have acted or refused to act on grounds generally applicable to the class, making injunctive and declaratory relief appropriate with respect to the class as a whole.

310.    Defendants have engaged in a consistent pattern of wrongful activity undertaken under a regulatory scheme that is common to all class members.

311.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to any other available method for the fair and efficient adjudication of the controversy presented here.

## CLAIMS FOR RELIEF

### COUNT I:   THE DEFENDANTS VIOLATED THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION

312.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-311 as if fully set forth herein.

313.    The retroactive application of a new law, resulting in a significant risk of prolonging a person's sentence beyond what would have resulted under the guidelines in effect when the person was convicted, constitutes a violation of the Ex Post Facto Clause of the United States Constitution.

314.   All persons are entitled to know the range of potential punishments before they decide to break the law, during the adjudication of their case, and at sentencing. The Ex Post Facto Clause assures that individuals are given fair warning of what actions will be punished and the *degree to which they will be punished.*

315.   By wrongfully applying the 2000 Guidelines, which the Commission adopted long after the offenses allegedly committed by the class members, the Defendants and their predecessors have denied the Plaintiffs' and the class members' requests for parole, significantly lengthened their incarcerations, and significantly increased the risk that their incarceration will be prolonged. Defendants have significantly increased the risk that Plaintiffs and class members will serve longer periods of incarceration than they would have if their hearings were held under the 1972 Regulations by:

a.   increasing the period the 1972 Regulations considered as satisfying offense accountability, by adding months to the Plaintiffs' parole eligibility dates based on violence of the offense or death of the victim;

b.   unilaterally and retroactively increasing the Plaintiffs' minimum sentence for offense accountability by adding a term of years to Plaintiffs' guideline range based on the type of offense the Plaintiff committed, and for which Plaintiff had already been punished, a practice that was not part of the 1972 Regulations;

b.   failing to give Plaintiffs credit for program achievements and self-improvement efforts pursuant to the 1972 Regulations;

c.   increasing Plaintiffs' guideline ranges by considering disciplinary infractions that cannot be considered under the 1972 Regulations;

d.   failing to consider mitigating factors; and

e.   failing to consider as a mitigating factor the internal and external difficulties that

contributed to the offender's actions, and the offender's efforts to address those issues.

316.   By ignoring the 1972 Regulations that consider the Plaintiffs' and class members'

minimum sentences as satisfying offense accountability, the Defendants have significantly

increased the risk that the Plaintiffs and class member will be incarcerated longer than they

would have been had the 1972 Regulations been applied as the Constitution requires.

317.   Defendants have significantly increased the risk that Plaintiffs and class members

will be incarcerated longer by failing to award Plaintiffs and class members credit for their

program achievements.

318.   Similarly, Defendants have significantly increased the risk that Plaintiffs and class

members will be incarcerated longer by failing to award them credit for their program

achievements on the entirely subjective basis that individuals' achievements do not rise to the

level of "superior program achievement." By contrast, the 1972 Regulations required credit for

consistent participation in self-improvement activities, efforts viewed in light of personal

limitations, and overall adjustment and ability to handle interpersonal relationships.

319.   Defendants have caused longer periods of incarceration, or significantly increased

the risk that Plaintiffs and class members will be incarcerated longer, than would have occurred

if their parole hearings were conducted under the 1972 Regulations, by considering institutional

infractions that would not have affected the analysis of parole applications under the 1972

Regulations.

## COUNT II:  VIOLATION OF THE PLAINTIFFS' FIFTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS

320.   Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1-319 as if

fully set forth herein.

321.    Plaintiffs and class members have constitutionally protected interests in receiving credit for their program and work achievement as provided for under the 1972 Regulations and the 1987 Guidelines.  The Defendants have refused to give Plaintiffs and class members credit for such achievement earned prior to their parole hearings.

322.    The Defendants continue to apply improper and unilaterally-adopted standards, rather than the Constitutionally-mandated 1972 Regulations.

323.    Defendants have even failed to apply the very guidelines that they officially state they are applying.  In doing so, Defendants violate the due process rights of the Plaintiffs and the class under the Fifth and Fourteenth Amendments to the United States Constitution.

324.    As a result, Defendants have denied Plaintiffs their constitutional rights to a fair parole review process.

## RELIEF REQUESTED

Wherefore, the Plaintiffs, on their own behalves and on behalf of all other similarly situated, respectfully request judgment against the Defendants, as follows:

1.    an order directing immediate re-hearings for all class members who have previously been denied parole under the 2000 Guidelines, within 120 days, at which Defendants are required to apply the Parole Board's statutes, regulations, guidelines, policies and practices that were in effect at the time of the class members' offenses, including but not limited to the 1972 Regulations;

2.    a declaration that the class members' service of their sentences to their parole eligibility dates satisfies their "offense accountability" for parole consideration purposes;

3.    an order directing the Commission to apply the Parole Board's statutes, regulations, guidelines, policies and practices that were in effect at the time of the class

members' offenses, including but not limited to the 1972 Regulations, at the initial parole

hearings of those class members who have not yet had their initial hearings;

4.      an award to the Plaintiffs of their attorneys fees and litigation expenses, pursuant

to 42 U.S.C. § 1988(b); and

5.      such other and further relief as the Court may deem just and proper.


Dated: May 24, 2010


                                        Respectfully submitted,



                                        _____
                                        Kenneth J. Pfaehler (DC Bar No. 461718)
                                        Sonnenschein Nath & Rosenthal LLP
                                        1301 K Street, N.W.
                                        Suite 600, East Tower
                                        Washington, D.C. 20005
                                        Phone: 202-408-6868
                                        Facsimile: 202-408-6399
                                        kpfaehler@sonnenschein.com

                                        Philip Fornaci (DC Bar No. 434824)
                                        Ivy Finkenstadt (DC Bar No. 488147)
                                        Washington Lawyer's Committee
                                          for Civil Rights and Urban Affairs
                                        11 Dupont Circle, N.W.
                                        Suite 400
                                        Washington, D.C. 20036
                                        Phone: 202-319-1000
                                        Fax 202-319-1010
                                        Philip_fornaci@washlaw.org
                                        Ivy_finkenstadt@washlaw.org

                                        *Attorneys for Plaintiffs*