# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **ROY A. DANIEL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 10-cv-00862 (APM)** |
| ) | |
| **J. PATRICIA WILSON SMOOT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

_____ )

## MEMORANDUM OPINION AND ORDER

This case is back before the court on a motion by Defendants the U.S. Parole Commission and its individual Commissioners (collectively, "Defendant" or "the Commission"), to reconsider the court's decision of February 13, 2018. *See* Mem. Op., ECF No. 99. That decision concerned a motion by Plaintiffs—individuals who remain incarcerated for D.C. Code offenses that occurred on or before March 3, 1985, but who have never received parole—to enforce a Settlement Agreement that requires the Commission to conduct Plaintiffs' parole hearings using the guidelines that were in place at the time of their offenses. Plaintiffs had alleged that the Commission was not carrying out its obligations under the Agreement in good faith, both with respect to its actual parole decisions and the scheduling of any subsequent hearings following a denial of parole. The court agreed with Plaintiffs only as to the latter issue, finding that the Commission, by ordering set-offs of greater than one year for the lion's share of offenders, was violating the mandate that rehearings "ordinarily" be held within one year. The court ordered the Commission to hold rehearings as soon as practicable for all inmates who had no recent disciplinary actions.

Defendant now asks the court to revisit its decision on grounds that the order is contrary to the terms of the parties' Settlement Agreement, improperly cabins the Commission's discretion, and assigns undue weight to Plaintiffs' evidence. Upon consideration of the parties' arguments and evidence, the court denies in part and grants in part Defendant's motion.

## II.     BACKGROUND

### A.     History of the Parole Guidelines

The court begins with some historical background. Until 1997, the District of Columbia Board of Parole ("Board") made parole determinations for D.C. Code offenders. Between 1972 and 1985, the Board applied a set of guidelines that it had adopted in 1972 ("1972 Guidelines"). The 1972 Guidelines supplied non-exhaustive factors for the Board to consider when making parole determinations. *See* 9 D.C.R.R. § 105.1 (1972). If the Board denied parole, the 1972 Guidelines provided a general rule for imposing "set-offs," that is, the time period between the denial of parole and the next parole consideration hearing, or "rehearing." *See* 9 D.C.R.R. § 103 (1972). The rule stated as follows:

> All prisoners serving a maximum sentence of less than five years who were denied parole at their original parole hearing will ordinarily be granted a rehearing no later than six months after the Board's last action.
>
> Prisoners serving a maximum sentence of five years or more who were denied parole at their original hearing *ordinarily* will receive a rehearing one year after the last action taken by the Board. . . .
>
> In all cases of rehearings, the Board reserves to itself the right to establish a rehearing date at any time it feels such would be

> proper, regardless of the length of sentence involved or the time
> remaining to be served.

*Id.* (emphasis added).  Although the 1972 Guidelines granted the Board discretion to deviate

from the "ordinary" one-year set-off, it was silent as to the factors that might warrant a departure.

*See id.*

The Board adopted new parole guidelines in 1985, which came to be known as the "1987

Guidelines," in reference to the year they were published.  *See* Paroling, Recommitting, and

Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District

of Columbia Codes, 80 Fed. Reg. 63,115-01, 63,115 (Oct. 19, 2015) (Final Rule) (noting a March

4, 1985, effective date for the "1987" regulations, which replaced the 1972 regulations); *see also*

*Sellmon v. Reilly*, 551 F. Supp. 2d 66, 85 (D.D.C. 2008) (noting that the 1987 regulations were

"formally adopted in 1985 and published in May 1987").  The 1987 Guidelines contained a rule

similar to that of its predecessor regarding rehearings.  It, too, stated that individuals serving

maximum sentences of five or more years "ordinarily shall receive a rehearing one (1) year after

the last action taken by the Board," though the Board retained discretion to establish any rehearing

date it deemed proper.  D.C. Mun. Regs. tit. 28, § 103 (1987).  Like the 1972 Guidelines, the 1987

Guidelines did not specify criteria the Board could consider in deciding whether to impose a set-

off of greater than one year.

For decades, the Board made set-off determinations under the operative Guidelines, and

those alone.  But that changed in the early 1990s.  In late 1991, the Board adopted, and then

amended in early 1992, policy guidance that for the first time gave shape to the Board's discretion

in scheduling rehearings.  *See* D.C. Board of Parole, Policy Guideline, *Reconsideration Hearings-*

*—Establishing Dates*, April 27, 1992 [hereinafter 1992 Policy Guideline].  The 1992 Policy

Guideline enumerated multiple, non-exhaustive aggravating and mitigating factors that the Board

could consider when determining whether to assign an offender a rehearing date that was later or earlier than the one-year norm. *See id.* §§ V.A.2, V.A.3. Aggravating factors included: that "[t]he instant offense involved ongoing criminal behavior of leadership role in an organized, criminal venture"; "a lengthy history of criminally-related alcohol and/or substance abuse"; "an unusually extensive or serious prior record (at least five felony convictions)"; "[t]he instant offense involved unusual cruelty to victim(s) or involved especially vulnerable victims"; and "repeated or extremely serious negative institutional behavior." *Id.* § V.A.2. Mitigating factors included: that the defendant "has been [an] exceptional program participant"; "a record of exclusively trivial offenses"; "a substantial crime-free period since the last offense"; and "[t]here has been a substantial previous period in custody on other sentence(s) or the prisoner faces a substantial period of time on additional committed sentences." *Id.* § V.A.3. Thus, although one year remained the norm for a set-off under the 1992 Policy Guideline, the Board now had defined factors that would warrant a departure, including notably the severity of the offense conduct.

Congress eliminated the D.C. Board of Parole in 1997 and assigned the Board's task of making parole decisions for persons convicted of violations of District of Columbia law to the United States Parole Commission. Balanced Budget Act of 1997, Pub. L. 105-33, § 11231(a)–(b). In 2000, the Commission adopted new guidelines for D.C. Code offenders ("2000 Guidelines"). *See* 28 C.F.R. §§ 2.70 *et seq.* The 2000 Guidelines required the Commission assign numerical values to aspects of an individual's pre- and post-incarceration history, and then use that number as a proxy for the risk posed by the offender in making paroling decisions. 28 C.F.R. § 2.80(b)–(n); *see also Sellmon*, 551 F. Supp. 2d at 73. As to set-offs, the 2000 Guidelines called for a presumptive three-year time period between parole consideration hearings, 28 C.F.R

§ 2.75(a)(1)(iv), while granting the Commission discretion to shorten that period if "new and significant information concerning the prisoner" became available, *id.* § 2.75(e).

**B.     Procedural Background**

*1.     The Initial Litigation*

Plaintiffs[1] are individuals who were convicted of D.C. Code offenses that occurred on or before March 3, 1985, and who became eligible for parole on or after August 5, 1999, but remain incarcerated. Pls.' Mem. in Supp. of Mot. to Enforce Settlement Agreement, ECF No. 82 (under seal) [hereinafter Pls.' Mem. to Enforce], at 1; *see also* Stipulation of Settlement & Dismissal, ECF No. 77 [hereinafter Settlement Agreement], at 1. They filed this action challenging the U.S. Parole Commission's use of the 2000 Guidelines, instead of the 1972 Guidelines that were in place at the time of their offenses, as violating the Ex Post Facto Clause and Due Process Clauses of the U.S. Constitution. *See generally* Compl., ECF No. 1. The gravamen of Plaintiffs' Complaint was that Defendant's application of the 2000 Guidelines created a "significant risk" of an increased minimum sentence that Plaintiffs had to serve before becoming eligible for parole. *Id.* ¶ 313. In other words, Plaintiffs alleged that applying the 2000 Guidelines prolonged their terms of incarceration relative to the 1972 Guidelines. *See, e.g.*, *id.* ¶ 88; *see also id.* ¶¶ 52, 54, 56, 63, 69. As relief, Plaintiffs asked the court to direct the Commission to hold immediate rehearings for themselves and similarly situated offenders and to order the Commission to apply the "Parole Board's statutes, regulations, guidelines, policies and practices that were in effect at the time" their offenses were committed, meaning the 1972 Guidelines. *See id.* ¶¶ 65–66.

Although the Complaint focused primarily on the risk of prolonged incarceration under the Commission's 2000 Guidelines relative to the Board's 1972 Guidelines, the Complaint contained

---

[1] For ease of reference, the court refers to the named Plaintiffs and all similarly situated D.C. Code offenders who are covered by the Settlement Agreement as "Plaintiffs" in this opinion.

a single paragraph regarding the difference in the timing of rehearings under the two regimes. Specifically, Plaintiffs alleged:

> [U]nder both the 1972 Regulations and the 1987 Guidelines, even if the Board denied parole to a prisoner serving a sentence greater than five years, he would only have to wait one more year for another opportunity at parole. By comparison, under the 2000 Guidelines the same prisoner must wait at least three years, possibly more, for another parole hearing even when he was already within his 2000 Guidelines range at his first hearing.

*Id.* ¶ 111. And, while the Complaint generally asked the court to order the Commission to apply the 1972 Guidelines, Plaintiffs sought no specific relief concerning the Board's set-off policies and practices.

The district court initially dismissed the class-action Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Daniel v. Fulwood*, 823 F. Supp. 2d 13, 15 (D.D.C. 2011), *rev'd*, 766 F. 3d 57 (D.C. Cir. 2014). The D.C. Circuit, however, reversed, holding that Plaintiffs "raised a plausible claim that the application of the [2000 Guidelines] to their cases violates the Ex Post Facto clause" because those rules and their application "indicate that [Plaintiffs] are subject to a long presumptive period of parole unsuitability that would not have applied to them under the 1972 Guidelines." *Daniel*, 766 F.3d at 66. The D.C. Circuit, however, made no mention of the two regimes' respective rules on the timing of rehearings. *See generally id.*

### 2. Proceedings on Remand

The Circuit's decision set in motion a series of events that ultimately ended with the Settlement Agreement that is the subject of the motion presently before the court. With the case on remand in the spring of 2015, Defendant stated to the court that it was considering "a rule change that would grant hearings to Plaintiffs pursuant to the 1972 regulations." *See* Def.'s Mot.

to Dismiss, ECF No. 68 [hereinafter Def.'s Nov. 11, 2015, Brief], at 5 (summarizing representations Defendant made to the court at an April 29, 2015 status conference). While the Commission was considering such action, Plaintiffs filed an Amended Complaint that repeated the substance of their initial complaint, including, once again, only a passing reference to the timing of rehearings. *See generally* Am. Compl., ECF No. 50; *see also id.* ¶ 105.

Soon thereafter, on October 14, 2015, Defendant promulgated and published a new rule, 28 C.F.R. § 2.80(p) ("New Regulation"). Def.'s Nov. 11, 2015, Brief at 5; *see* 28 C.F.R. § 2.80(p). The New Regulation, generally speaking, provided that the Commission would "apply the parole guidelines of the former District of Columbia Board of Parole that were in effect until March 4, 1985, in its parole decisionmaking for D.C. Code prisoners who committed their offenses while those guidelines were in effect." 80 Fed. Reg. at 63,115. In other words, by adopting the New Regulation, the Commission through rulemaking agreed to apply the 1972 Guidelines to Plaintiffs. On the subject of rehearings, the New Regulation provides:

> A prisoner who committed the offense of conviction on or before March 3, 1985 who is not incarcerated as a parole violator and is serving a maximum sentence of five years or more who was denied parole at their original hearing ordinarily will receive a rehearing one year after a hearing conducted by the U.S. Parole Commission. In all cases of rehearings, the U.S. Parole Commission may establish a rehearing date at any time it feels such would be proper, regardless of the length of sentence involved. No hearing may be set for more than five years from the date of the previous hearing.

28 C.F.R. § 2.80(p)(5). This text of the New Regulation is nearly identical to that found in the 1972 Guidelines. *Compare* 28 C.F.R. § 2.80(p)(4)–(5), *with* 9 D.C.R.R. §§ 105.1, 103 (1972).

The Commission's rulemaking set the table for resolving this matter. On December 18, 2015, two months after the adoption of the New Regulation, Plaintiffs and the Commission entered into a Settlement Agreement, the centerpiece of which was the Commission's

commitment to apply the New Regulation in "good faith." *See* Settlement Agreement at 2. Under the Agreement's terms, the Commission also promised to conduct initial parole hearings under the terms of the 1972 Guidelines for all Plaintiffs, including those who had received parole denials under the 2000 Guidelines. *See id.* The court approved the Settlement Agreement on February 10, 2016. *Id*. at 9.

Over the next seven months, the Commission held initial parole hearings under the 1972 Guidelines for 56 offenders, granting parole to some but denying parole to most. Mem. Op. at 7; *see* Pls.' Mem. to Enforce, Ex. 2, ECF No. 82-1 [hereinafter Parole Records], at 1. Additionally, for those offenders denied parole, the Commission ordered set-offs of more than one year in the vast majority of cases. *See* Parole Records at 1.

### 3. *Plaintiffs' Motion to Enforce*

The Commission's predominantly adverse parole decisions prompted Plaintiffs, on April 27, 2017, to file a motion to enforce the Settlement Agreement ("Motion to Enforce" or "Plaintiffs' Motion"). *See* Pls.' Mot. to Enforce Settlement Agreement, ECF No. 81; Pls.' Mem. to Enforce. Plaintiffs alleged that the Commission was not "in good faith" applying the 1972 Guidelines— both with respect to parole decisions and to the scheduling of rehearings—and sought a court order directing the Commission to comply with the terms of the agreement. Pls.' Mem. to Enforce at 5– 10. As to the latter issue, Plaintiffs objected to the Commission's setting of rehearings two or more years into the future, because the 1972 Guidelines, as well as the New Regulation, provided that set-offs "ordinarily" would be one year. *Id*. at 9–10. Parole records showed that of the 37 individuals who were denied parole at their initial hearings held pursuant to the Settlement Agreement, only four—less than 11%—received one-year set-offs; the rest received two-, three-, four-, or five-year set-offs. Parole Records at 1.

To buttress their claim, Plaintiffs submitted a declaration from Walter Ridley, who was the chairman of the District of Columbia Parole Board "in 1985 and 1986." Pls.' Mem. to Enforce, Ex. 1, ECF No. 82-1 [hereinafter Ridley Decl.], at 1. According to Ridley, the D.C. Board "very seldom" scheduled set-offs for greater than one year, and it assigned longer rehearing dates "only if the person had serious disciplinary infractions or other institutional problems since their last parole hearing." *Id*. at 1–2. Ridley further attested that the nature of the applicant's offense of conviction was not relevant to a Board rehearing decision, stating that the Board "did <u>not</u> consider the severity of an individual's original offense" when considering the length of a set-off. *Id*. at 2.

The Commission opposed Plaintiffs' Motion. Although conceding that the 1972 Guidelines and the New Regulation called for a one-year set-off in the "ordinary" case, the Commission argued that the 1972 Guidelines gave the D.C. Board broad, unreviewable discretion to impose set-off terms of greater than one year. *See generally* Def.'s Opp'n to Pls.' Mot. to Enforce Settlement Agreement, ECF No. 88 [hereinafter Def.'s Opp'n to Pls.' Mot.], at 8. It also maintained that the offenders to whom the New Regulation applied were an "extraordinary group," because of their violent conduct, criminal records, or misdeeds while incarcerated. *Id.* at 8. The Commission argued that Plaintiffs, therefore, "may be the exception to the rule that the Board had in mind when it promulgated the exception to the 12-month rule." *Id*.

On February 13, 2018, the court ruled in favor of Plaintiffs on the set-off issue, holding that the Commission was not applying the New Regulation in good faith with respect to the scheduling of rehearings. Mem. Op. at 14–18. The court explained that the New Regulation— which incorporated 1972 Guidelines nearly wholesale—"provided clear direction on the scheduling of set-offs." *Id*. at 14. The New Regulation, like the 1972 Guidelines, contained a "presumptive one-year set-off," *id.* at 15, as evident from the New Regulation's text providing that

an offender "who was denied parole at their original hearing *ordinarily* will receive a rehearing one year after a hearing conducted by the U.S. Parole Commission," *id*. at 14 (quoting 28 C.F.R. § 2.80(p)(5)). Relying on the extremely high rate at which the Commission imposed set-offs of more than one year—nearly 90% of the time—and Ridley's unopposed declaration, the court concluded that the Commission was not in good faith complying with the Settlement Agreement because it was not "ordinarily" granting one-year set-offs, as required. *Id*. at 15, 17–18. Although the court recognized that the New Regulation, like the 1972 Guidelines, vested broad discretion in the Commission to impose a set-off of more than one year, the court found Defendant's reliance on that discretion to be "unconvincing" in light of the disproportionate percentage of offenders who received set-offs of more than one year. *See id*. at 15–16 (internal citation omitted).

The court similarly rejected Defendant's alternative argument that Plaintiffs might be the "exceptional cases" that justify a significant deviation from the norm. *See id*. at 16. The court held that "[n]othing in the 1972 guidelines" supported the Commission's speculation that Plaintiffs "*may be* the exception to the rule the Board had in mind when it promulgated" the discretionary provision. *Id*. at 17 (quoting Def.'s Opp'n to Pls.' Mot. at 8). Indeed, the only record evidence of the D.C. Board's practices was that of Ridley, who attested that the Board only imposed set-offs of greater than a year in cases of recent institutional misconduct. *See* Ridley Decl. at 1–2. The court ordered the Commission to hold rehearings, as soon as practicable, for each offender who had not received a one-year set-off after his initial parole hearing and had no disciplinary infractions since that initial hearing. Order, ECF No. 100.

Believing the court got it wrong, Defendant filed the instant Motion to Alter Judgment ("Defendant's Motion") one month later, on March 13, 2018. *See* Def.'s Mot. to Alter J. as to Order, Mem. & Op., ECF No. 102 [hereinafter Def.'s Mot. to Alter]. In its motion, Defendant

claims that reconsideration is warranted because the court's decision "requiring annual parole hearing[s] for nearly all D.C. Offenders subject to the D.C. Board's 1972 guidelines is contrary to law" for a variety of reasons. Def.'s Mot. to Alter, Mem. in Supp., ECF No. 102-1 [hereinafter Def.'s Mem.], at 3. Among them are that: (1) the court's interpretation of the Settlement Agreement is inconsistent with the broad discretion the Commission enjoys; (2) the evidence the court relied upon, especially Ridley's declaration, was "insufficient and unreliable," and the court ignored case law showing that the D.C. Board, under the 1972 Guidelines, did impose set-offs of more than one year based on offense severity; and (3) the court's decision improperly requires the Commission to waste resources by requiring "*pro forma*" annual hearings. In the alternative, should the court not grant Defendant's motion in full at this time, Defendant asks the court to delay taking any action until the D.C. Circuit resolves two cases that are pending review.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) "provides a limited exception to the rule that judgments are to remain final." *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). "[T]he reconsideration or amendment of a judgment is nonetheless an extraordinary measure." *Id.* A court has discretion to grant a Rule 59(e) motion to amend or alter a judgment in only three circumstances: "(1) if there is an 'intervening change of controlling law'; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to 'correct a clear error or prevent manifest injustice.'" *Id.* (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam)). A losing party may not, however, use a Rule 59(e) motion "to relitigate old matters, or to raise new arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping v. Baker*, 554 U.S. 471, 486 n.5 (2008) (citation omitted).

Moreover, a Rule 59(e) motion is "not a vehicle to present a new legal theory that was available prior to judgment." *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012).

In this case, the Commission asserts as the basis for reconsideration only that the court committed clear error in finding the Commission to have breached the Settlement Agreement. Def.'s Mem. at 1.

## IV.    DISCUSSION

### A.    The Origins of the New Regulation and the Settlement Agreement

Before determining whether the court clearly erred in its decision enforcing the Settlement Agreement, it is worthwhile to revisit how the parties arrived at their pact in the first place. This case began with constitutional challenges—one rooted in the Ex Post Facto Clause, the other in the Due Process Clause—to the Commission's use of the 2000 Guidelines to a class of offenders whose crimes were committed on or before March 3, 1985, and who had not received parole. *See generally* Compl. Both claims focused primarily on the premise that applying the 2000 Guidelines retroactively created a significant risk of prolonging the terms of incarceration for this group of offenders. *See generally id.* By contrast, the Complaint made only a passing reference to there being a difference in how the 2000 Guidelines and the 1972 Guidelines approached the issue of set-offs, noting that under the 2000 Guidelines offenders would have to wait at least three years or more for a rehearing, as compared to one year under the 1972 Guidelines. *Cf.* Compl. ¶ 111. The Complaint did not seek specific relief to remedy that divergence. Thus, as pleaded, the set-off issue was, at most, an ancillary one.

The D.C. Circuit's decision reversing the initial dismissal of Plaintiffs' Complaint reflects the set-off question's tangential quality. There, the Circuit held that Plaintiffs had stated a plausible Ex Post Facto claim because the 2000 Guidelines called for the use of factors that, in

practice, increased an offender's presumptive parole date as compared to the 1972 Guidelines, which did not employ that methodology. *Daniel*, 766 F.3d at 58–59. The Circuit made no mention of any difference in approach to set-offs between the two sets of Guidelines. *See generally Daniel*, 776 F.3d 57. And then, on remand, Plaintiffs gave no greater attention to the set-off question than they had before the appeal. Like their initial pleading, Plaintiffs' Amended Complaint contained only a one-paragraph allegation about the differing set-off approaches. Am. Compl. ¶ 105.

Plaintiffs' near-singular focus on parole suitability and length of incarceration, rather than the timing of rehearings, is wholly understandable when put in context of pertinent Supreme Court jurisprudence. In *California Department of Corrections v. Morales*, 514 U.S. 499 (1995), the Supreme Court considered the retroactive application of a California law that gave the state parole board discretion to hold parole hearings for repeat murder offenders as infrequently as every three years, even though the law in place at the time of the offender's crime called for annual parole suitability hearings. *Id*. at 503. The Court held that applying the new state law retroactively to an offender who was already serving his sentence created no Ex Post Facto Clause violation. *Id*. at 514. The Court reasoned that statutory change had less to do with increasing punishment than it did relieving the parole board from conducting time-consuming annual parole hearings for offenders "who have no reasonable chance of being released." *Id*. at 507; *accord id*. at 512 ("[T]he Amendment simply allows the Board to avoid the futility of going through the motions of reannouncing its denial of parole suitability on a yearly basis."). Accordingly, the retroactive application of the law did not violate the Constitution.

Not long after, the Court decided *Garner v. Jones*, 529 U.S. 244 (2000), which went even further than *Morales* in permitting retroactive application of longer parole consideration terms. The Court in *Garner* considered an inmate's challenge to a Georgia state parole board rule that

13

would allow the state board to set a parole reconsideration date eight years later for an inmate serving a life sentence, when the board's rule at the time of the inmate's offense called for reconsideration every three years. *Id*. at 247. Even though the new rule increased the time between parole hearings, the Court found the change was not necessarily an Ex Post Facto violation because the Board retained discretion to set the date for reconsideration and the Board's policies allowed for earlier review if the facts of an individual's case warranted it. *See id.* at 254. With nothing more than the text of the rule before it, the Court could not conclude that the change lengthened the inmate's imprisonment or created a "significant risk" of extending his incarceration. *Id*. at 251, 256. The court stated that: "Georgia law vests broad discretion with the Board, and our analysis rests upon the premise that the Board exercises its discretion in accordance with its assessment of each inmate's likelihood of release between reconsideration dates." *Id.* at 256. Thus, as it did in *Morales*, the Court held that retroactive application of a potentially longer set-off period, in which the decision-maker retained discretion to adjust its timing, by itself, did not violate the Constitution. *See id.*

*Morales* and *Garner* supply an important frame of reference for this litigation. Those cases make clear that, when Plaintiffs filed this action, they faced an uphill battle to prove that the Commission's retroactive application of the 2000 Guidelines with regard to set-offs violated the Ex Post Facto Clause. Indeed, like the policy at issue in *Garner*, the 2000 Guidelines grant the Commission some discretion as to the length of time between parole hearings for D.C. Code offenders. *See* 28 C.F.R. § 2.75(e) (providing the Commission with the authority to "reopen any case for a special reconsideration hearing . . . upon the receipt of new and significant information concerning the prisoner"); *cf. Garner*, 529 U.S. at 254 (noting that the Georgia Board's rules permitted expedited parole reviews in the event of a change in circumstance or where new

information would warrant a sooner review). As a result, Plaintiffs would have had to overcome substantial obstacles in order to establish a constitutional violation based on the Commission's use of the 2000 Guidelines to set future hearings.

Against this favorable legal landscape, the Commission in this case nevertheless voluntarily agreed to make one year the "ordinary" time period between hearings not once, but *twice*, for the present group of offenders. It did so for the first time through the rulemaking process. When the Commission first publicly issued notice and comment for what would become the New Regulation, its proposed text was silent as to any presumptive period of time between hearings. *See generally* Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes, 80 Fed. Reg. 34,111-02 (June 15, 2015) (Notice of Proposed Rulemaking). This proposal was met with recommendations from "[m]any commenters" that the final rule "include the provision in the D.C. Board's 1972 regulations that called for annual rehearings." *See* 80 Fed. Reg. at 63,115. The Commission heeded those requests. *See* 28 C.F.R. § 2.80(p)(5). When publishing the final rule, it noted that the New Regulation "restates the D.C. Board's [1972] regulation calling for annual hearings as suggested, but includes the portion of the . . . regulation that permits the Commission to establish a rehearing date 'at any time it feels such would be proper.'" 80 Fed. Reg. at 63,115. The Commission's General Counsel later acknowledged to this court that, in adopting the New Regulation, the Commission had gone above and beyond what the law obligated it to do:

> Notwithstanding the fact that, as Judge Huvelle found in *Sellmon v. Reilly*, 551 F. Supp. 2d 66 (D.D.C. 2008), not all retroactive application[s] of changed rules implicates the *Ex Post Facto* Clause for all prisoners, for **administrative convenience and consistency** with the "*Sellmon Rule*," **the Commission has decided** that it will

> apply the parole guidelines that were in effect when the offenders committed their offenses.

Def.'s Mot. to Stay Disc., ECF No. 64, Ex. 1, Decl. of Helen H. Krapels, ECF No. 64-1 [hereinafter Krapels Decl.], ¶ 4 (emphasis added).[2] Thus, the Commission is on record as stating that the New Regulation affords Plaintiffs greater protections than the minimum required by law.

The Commission reaffirmed its commitment to the one-year norm when it entered into the Settlement Agreement with Plaintiffs. *See generally* Settlement Agreement. As noted, the centerpiece of the Settlement Agreement is Defendant's commitment to apply the New Regulation "in good faith." Thus, by promising to adhere to the New Regulation as promulgated, the Commission agreed to apply the one-year set-off norm "in good faith."

With this background in mind, the court now turns to the arguments for reconsideration made by Defendant.

### B.   Defendant's Arguments

#### 1.   *The Court Misconstrued the Plain Text of the New Regulation and Relevant Case Law*

Defendant's primary argument centers on discretion. Defendant asserts that the court's ruling is contrary to the plain text of the New Regulation and precedent interpreting the 1972 Guidelines, both of which establish that the Commission has near-absolute discretion in setting rehearing dates on a case-by-case basis. Def.'s Mem. at 3–5. The Commission also insists that the court overlooked case law recognizing the D.C. Board's broad discretion to impose set-offs of greater than one year, citing five decisions: two from the D.C. Court of Appeals, one from the Third Circuit, one from the Seventh Circuit, and an additional decision from the U.S. District Court

---

[2] The Commission made a similar concession when it adopted the New Regulation as a final rule. The Commission noted that "federal courts have declined to find that [the] Commission's use of its revised guidelines"—an apparent reference to the 2000 Guidelines—"violates the Ex Post Facto Clause" because of the "broad discretion" the 1972 Guidelines gave the D.C. Board. 80 Fed. Reg. at 63,115.

for the District of Columbia. *Id.* at 4–5; *see also id.* 13–14 (discussing an additional D.C. Court of Appeals decision and a D.C. Circuit decision). In short, Defendant asserts that the court's decision is rooted in a clear error of law.

Defendant's argument is not new, however. Defendant made the very same contention in its opposition to Plaintiffs' Motion to Enforce, citing the D.C. Board's discretion to set rehearing dates "at any time it feels such would be proper." Def.'s Opp'n to Pls.' Mot. at 8 (quoting 9 D.C.R.R. § 103). The court's decision explained why that text did not save the Commission. *See* Mem. Op. at 14–16 (discussing the New Regulation's employment of a "presumptive one-year set-off" and its provision granting the Commission "discretion in how long to fix a set-off"). A motion for reconsideration cannot be used to relitigate previously rejected lines of argument, *see Exxon Shipping*, 554 U.S. at 485 n.5, and thus, the court rejects this argument outright.

In any event, the court's ruling is in no way at odds with the text of the New Regulation or the case law interpreting its older regulatory relative, the 1972 Guidelines. As the above history shows, the Commission, of its own volition through rulemaking, committed to "ordinarily" applying a one-year set-off to *all* offenders who committed offenses when the 1972 Guidelines were in effect but had not yet received parole. And then, by entering the Settlement Agreement, the Commission agreed that it would "ordinarily" grant annual parole hearings to Plaintiffs *in this litigation*. No court compelled the Commission to do so. And while it is true that, as part of the New Regulation, the Commission retained some discretion to impose set-offs of more than one year, such discretion cannot swallow whole the one-year norm that it agreed to apply to this defined group of Plaintiffs. Indeed, under the Commission's reading of the New Regulation, the term "ordinary" has no meaning. What conclusion is there to draw, other than the one the court reached,

when the Commission exceeds the adopted and agreed-upon one-year norm in 33 out of 37, or 90 percent, of Plaintiffs' cases?  The term "ordinarily" simply cannot be disregarded.  Yet, that is precisely what the Commission did.

Nor does the Commission's insistence that these offenders are the "worst of the worst" excuse it from imposing one-year set-offs.  The Commission claims that it exercised its discretion on a case-by-case basis, and that the high rate of set-offs of more than one year can be explained by the fact that the offenders in question committed the most serious crimes and therefore "are *not* representative of the bulk of the many thousands of offenders to whom the 1972 regulations have applied over time."  Def.'s Mem. at 8.  The Commission made that same argument before, *see* Def.'s Opp'n to Pls.' Mot. at 8, and the court rejected it, *see* Mem. Op. at 16–17.  Nevertheless, the court explains its decision here once more.  The problem with this argument is that the Commission agreed to "ordinarily" hold annual hearings for *this very group of offenders*, not some nebulous set of prisoners.  When it adopted the New Regulation and entered into the Settlement Agreement, the Commission well understood that these offenders had committed the most serious crimes.  No one pulled the wool over its eyes.  Still, the Commission *voluntarily* committed to apply a one-year set-off norm to *this group* of offenders. And, at no time did it ever expressly say or intimate that Plaintiffs would not qualify for a one-year set-off because of the seriousness of their crimes.  The Commission's position is, in essence, that it engaged in rulemaking and settlement with its fingers crossed, only to back out of its promises when the ink was dry.  The plain text of the New Regulation and the Settlement Agreement cannot countenance such an outcome.

The Commission also argues that the longer set-offs here were a proper exercise of its discretion when viewed relative to the application of the 1972 Guidelines to *all* offenders who committed offenses, of any kind, prior to 1985. Def.'s Mem. at 6. As the Commission puts it:

> The fact that relatively fewer prisoners subject to the 1972 guidelines currently receive "ordinar[y]" set-offs is not a function of the Commission's disregard for the rules, but rather is a consequence of elapsed time: most "ordinar[y]" offenders who were sentenced while the 1972 Guidelines were in effect from 1972 to 1985 have been paroled or otherwise released. Most of the relative handful who remain are not "ordinary[.]"

*Id.* Because Plaintiffs "are *not* representative of the bulk of the many thousands of offenders to whom the 1972 regulations have applied over time," the Commission continues, their set-offs need not be in line with the norm. *See id.* at 8. This argument, however, misconstrues the relevant inquiry. The Commission agreed to "ordinarily" apply a one-year set-off to all offenders covered by the Settlement Agreement. Thus, whether the Commission acted in good faith in imposing set-offs is to be measured not against the hundreds or thousands of prisoners denied parole over the course of decades by the D.C. Board when applying the 1972 Guidelines. Rather, the relevant comparators are offenders subject to the Settlement Agreement, and only those offenders. When correctly viewed in this light, the Commission plainly did not comply with the terms of the Settlement Agreement because it did not "ordinarily" schedule rehearings within one year for those denied parole under the New Regulation.

Accordingly, the court rejects Defendant's contention that the court clearly erred in failing to recognize the breadth of the Commission's discretion with respect to setting dates for the reconsideration of parole.

2.      *The Evidence Relied upon by the Court was "[I]nsufficient and [U]nreliable"*[3]

Next, Defendant criticizes the evidence that the court relied upon in reaching its decision, calling it "insufficient and unreliable." *Id.* at 10. First, Defendant attacks the relevance of the "raw statistics" cited by the court, i.e., that nearly 90% of Plaintiffs received set-offs of longer than one year. *Id.* at 12. According to the Commission, that statistic:

> fail[s] to account . . . for the confounding factor that the cohort of prisoners still subject to the 1972 regulations have been winnowed over time to exclude nearly all but those convicted of the most serious crimes and/or those with the worst institutional misconduct. Nor do[es] [it] account for the extremely small sample size at issue.

*Id*. at 12. Thus, the Commission dismisses the data as having little probative value on the question of breach. Second, Defendant claims that the court gave undue weight to Ridley's declaration, when it was entitled to none. *Id*. at 10–12. Defendant challenges the basis for Ridley's testimony and also presents evidence to dispute his conclusions. Specifically, Defendant points to case law, which it asserts the court ignored, that purportedly contradicts Ridley's contention that the D.C. Board ordered set-offs of more than one year only in cases of recent institutional misbehavior. According to Defendant, the cited cases show that the D.C. Board under the 1972 Guidelines imposed longer set-offs because of the severity of a person's offense. *Id.* at 11–14.

The court rejects these contentions because, once again, the Commission is doing no more than relitigating arguments it already made or could have made. First, the court previously considered, and rejected, the Commission's argument that the "raw statistics," *id.* at 12, cannot be relied upon because they do not take into account the seriousness of this group of offenders' crimes within "the context of the larger group" subject to the 1972 Guidelines, *see* Def.'s Mot. at 8. *See* Mem. Op. at 16–17. Second, as to Ridley, Defendant's attack comes too late. In its earlier

---

[3] Def.'s Mem. at 10.

pleading, the Commission barely even mentioned Ridley; in fact, the Commission cited his declaration favorably. *See id.* ("Based upon the declaration of former Board member Walter Ridley, it is clear that the D.C. Board exercised [ ] discretionary authority" to set rehearing dates.). It did not contend in its brief, as it does now, that Ridley's testimony is of no probative value because it "[speaks] merely in the most general of terms"; "[h]is recollections are from what appears to be, at worst, a scarcely relevant timeframe, and, at best, a non-representative-transitory one;" and his "declaration nowhere indicates that [he] consulted anything other than his 31 year-old memories to support his statements." Def.'s Mem. at 10–12. Ridley's declaration was Plaintiffs' evidence of the D.C. Board's practices, and the Commission let it stand unrebutted. The Commission cannot now mount the aggressive attack that it could have made earlier. Moreover, the case law that the Commission now marshals could have been used before to attack Ridley. Defendant previously cited as evidence of the Board's practices two of the cases it now touts— *Hall v. Henderson*, 672 A.2d 1047 (D.C. 1996), and *Blair-Bey v. Quick*, 151 F.3d 1036 (D.C. Cir. 1996)—but not as a direct challenge to Ridley. *See* Def.'s Opp'n to Pls.' Mot. at 8. The court considered these cases and discussed them during the hearing on Plaintiffs' Motion, even though the Memorandum Opinion did not expressly address them.[4] So, the cited case law now used to undermine Ridley is not a valid reason to reconsider the court's decision.

---

[4] Plaintiffs' counsel brought up *Hall* and *Blair-Bey* when arguing that there was no evidence that the parole decision-maker could take into account the nature of an offender's crime when determining the length of a set-off:

> **Plaintiffs' counsel**: [The heinous nature of a crime] is not one of the criteria that's supposed to be taken into account with respect to what 'ordinarily' means . . . . [W]e see that, A, because there's been no contrary indication[.] [T]he two cases they've cited all . . . involve prisoners who had institutional misbehavior of a recent nature.
> **The court**: I read those two cases. Were they under—they actually arise under the '72 guidelines?
> **Plaintiffs' counsel**: It's—
> **The court**: I thought they arose under the—
> **Plaintiffs' counsel**: '87.
> **The court**: —'87 guidelines.

In any event, the court once again rejects these arguments in substance, with one qualification regarding Ridley's declaration, as discussed below. First, it remains the fact that the "raw statistics" that the Commission discounts stand as the main evidence of the Commission's conformance with the Settlement Agreement. Indeed, there is little other evidence for the court to consider, and what evidence there is does not aid the Commission. At the court's direction, the parties submitted hearing records for 13 of the offenders who were recommended for parole by hearing examiners in their initial hearings pursuant to the Settlement Agreement, but who were denied parole upon further review. *See* Nov. 20, 2017, Hr'g Tr., ECF No. 107 [hereinafter November Hr'g Tr.], at 35–36. Only one of the 13 individuals received a one-year rehearing. *See* Joint Suppl. Filing Pursuant to Nov. 20 Hr'g, ECF No. 96 [hereinafter Joint. Suppl. Filing]. Of the remaining 12 cases, in only three did the Commission explain its reason for its longer-than-one-year set-off. *See* Joint Suppl. Filing, Attach. 1, ECF No. 96-1, at 33, 43, 110. No reason was given for the longer set-off in the other nine cases. *See generally id.* Thus, the Commission records that are before the court provide little explanation for the Commission's set-off decisions.

Admittedly, as the Commission points out, *see* April 13, 2018, Hr'g Tr., ECF No. 108 [hereinafter April Hr'g Tr.], at 11–12; November Hr'g Tr. at 33; Def.'s Opp'n to Pls.' Mot. at 7, neither the New Regulation nor the Settlement Agreement require the Commission to explain its reasons for longer set-offs. And the Commission, of course, does not bear the burden of showing a breach of the Settlement Agreement. Yet, the Commission had ample opportunity to submit evidence to explain its decision-making in the face of Plaintiffs' statistical evidence, but simply

---

**Plaintiffs' counsel**: Yeah.
**The court**: Or maybe even the '92 guidelines.
**Plaintiffs' counsel**: I think it was '87 guidelines. There might have been a '92 further iteration of further guidelines.

Nov. 20, 2017, Hr'g Tr., ECF No. 107, at 8–9.

chose not to offer any. For example, the Commission could have submitted a sworn declaration from commissioners or agency officials explaining the reasons for the set-off numbers, or it could have offered other notices of action that explained the longer set-offs. In the end, in response to the "raw statistics," all the Commission put forth was the *litigation position* that it made set-off decisions on a case-by-case basis and imposed year-plus set-offs for 90% of those who were denied parole because of the severity of their offense conduct. *See* November Hr'g Tr. at 33–35. An unsupported legal position is not sufficient to overcome overwhelming statistical evidence showing the Commission's persistent deviation from the agreed-upon one-year norm.

Nor has the Commission offered relevant evidence of the D.C. Board's actual practices under the 1972 Guidelines to show that the Commission's efforts to carry out the New Regulation are consistent with its predecessor's actions. Evidence of a parole board's actual practices can inform how the board interprets its governing regulations and policies. *See Garner*, 529 U.S. at 256. As the Commission acknowledges, the only evidence it put forth when initially opposing Plaintiffs' Motion—*and* now in support of its motion to reconsider—is case law that it says shows that the D.C. Board considered the severity of a prisoner's original offense when the 1972 Guidelines were in effect.

These cases do not, however, support that argument. The Commission is of the view that that decisions applying the 1972 Guidelines are the *only* relevant evidence of the D.C. Board's practices under the 1972 Guidelines. Therefore, according to the Commission, decisions made by the D.C. Board under subsequent guidelines and policies, including the successor 1987 Guidelines, shed no light on the D.C. Board's practices under the 1972 Guidelines. *See* April Hr'g Tr. at 18–

22.  It has taken the same position before the D.C. Circuit.  *See id.* at 19–20.[5]  Accepting the Commission's own view for present purposes, none of the cases it cites are relevant because each of them concern application of guidelines or policies *other than* the 1972 Guidelines.  In *Hall*— one of two cases cited in the Commission's opposition to Plaintiffs' motion, *see* Def.'s Opp'n to Pls.' Mot. at 8—the D.C. Board applied the 1992 Policy Guidelines when it gave the offender a five-year set-off, on grounds that the offender had displayed cruelty to the victims and had negative institutional behavior.  672 A.2d at 1049–52; *see also* Def.'s Mem. at 13 (citing *Hall*).  In the other previously cited case, *Blair-Bey*, the court did not specify the guidelines or policies that the D.C. Board applied when it gave the offender a five-year set-off in 1993.  *See generally* 151 F.3d 1036. It is likely, however, that the Board did *not* apply the 1972 Guidelines, as the reasons that the court identified for the longer set-off track nearly verbatim two of the aggravating factors under the 1992 Policy Guideline.  *Compare id.* at 1038, 1047–48 (citing the offender's "on-going criminal behavior" and his "repeated or extremely serious negative institutional behavior" when describing the Board's decision), *with* 1992 Policy Guideline § V.A.2 (providing that aggravating factors include "ongoing criminal behavior" and "repeated or extremely serious negative institutional behavior").  The newly-cited cases suffer from the same timing defect.  In *White v. Hyman*, 647 A.2d 1175 (D.C. 1994), the offender received a four-year set-off in October 1991 under the "Board's 'Policy Guideline,' which was initially adopted on December 16, 1991, and amended in April 1992," because of a "major disciplinary violation."  *Id.* at 1177–78; *see also* Def.'s Mem. at 14 (citing *White*).  Citing D.C. municipal regulations from 1988, the D.C. Court of Appeals in *Stevens v. Quick*, 678 A.2d 28 (D.C. 1996), held that the Commission had not abused its discretion

---

[5] *See* Br. of Apps., *Ford v. Masarone*, No. 16-5298 (D.C. Cir.), at 38–41 (asserting that the 1987 Guidelines altered the practices of the D.C. Board and thus are irrelevant to showing the Board's practices under the 1972 Guidelines); *see also id.* at 61.

by imposing a five-year set-off.  *Id.* at 31–32; *see also* Def.'s Mem. at 14 (citing *Stevens*).  And, finally, *Glascoe v. Bezy*, a case from the Seventh Circuit, concerned "the Commission's application of the 1999 guidelines, as opposed to those in effect at the time of Glascoe's conviction."  421 F.3d 543, 546 (7th Cir. 2005); *see also* Def.'s Mem. at 5 (citing *Glascoe*).  In summary, none of the cases cited by the Commission involve the 1972 Guidelines; all were decided under different regimes, which the Commission itself asserts are not relevant to demonstrating the Board's practices under the 1972 Guidelines.  Therefore, the court did not clearly err in not relying on these decisions as evidence of the D.C. Board's set-off practices.

That brings the court to Plaintiffs' declarant, Ridley.  The only evidence that the Commission offers to undermine Ridley's statement are the above-cited cases.  Defendant attacks Ridley's statement on other grounds—its use of "the most general of terms," its failure to state what guidelines he refers to, and his brief and dated familiarity with the Board's practices—but insofar as evidence goes, the only proof presented is case law.  *See* Def.'s Mem. at 10–11.  For the reasons already explained, the cited authorities shed no light on the D.C. Board's practices under the 1972 Guidelines.  Accordingly, they are not, as the Commission contends, "definitive proof that plaintiff[s]' declarant's recollections are inaccurate and/or unrepresentative."  *Id.* at 13.

Nevertheless, the court finds that it *did* clearly err in relying on Ridley's observations to make findings about the D.C. Board's actual set-off practices under the 1972 Guidelines.  As the Commission points out, Ridley's declaration does not identify the set of guidelines he uses as his point of reference to opine that the Commission's actions in this case deviate from the Board's historical approach to set-offs.  A simple internet search reveals, however, that Ridley cannot possibly speak to the Board's practices under the 1972 Guidelines, at least based on first-hand knowledge, for a simple reason: He was not on the D.C. Board when those guidelines were in

effect. As noted earlier, the parole regulations that are commonly known as the "1987 Guidelines" actually went into effect two years earlier than its moniker suggests, in March 1985. *See supra* at 3. Ridley, however, began his tenure as chairman of the D.C. Board in June of 1985, three months *after* the "1987" Guidelines took effect. *See* Sara Evans, *Barry Names New Head of Parole Board*, Wash. Post (June 5, 1985) (reporting that the mayor of the District of Columbia had appointed Ridley as the chairman of the D.C. Parole Board for a six-year term that would begin June 17, 1985).[6] When the court originally considered Plaintiffs' Motion to Enforce, it incorrectly believed that the "1987" Guidelines actually went into effect in 1987, and not two years earlier. So, when Ridley indicated that he "served as the chair of the former DC Board of Parole . . . in 1985 and 1986," Ridley Decl. at 1, the court assumed that his two-year tenure encompassed a time when the 1972 Guidelines were in effect. That assumption was mistaken. The *1987* Guidelines supplied the governing rules for nine-plus months of 1985 and the full year in 1986, the very time period that Ridley served as the Board's chairman. Neither side noted this timing discrepancy in its initial briefing.[7] In any event, having found that Ridley did not serve on the D.C. Board when the 1972 Guidelines were in effect, the court retracts its reliance on Ridley's declaration.

This confession of error does not, however, alter the court's conclusion that the Commission violated the Settlement Agreement. The uncontested statistical evidence marshalled by Plaintiffs provides compelling evidence, on its own, of the Commission's breach. The Commission agreed that this group of offenders "ordinarily will receive a rehearing one year after [an original] hearing conducted by the U.S. Parole Commission." 28 C.F.R. § 2.80(p)(5). Yet, in

---

[6]    *Available at* https://www.washingtonpost.com/archive/local/1985/06/05/barry-names-new-head-of-parole-board/9fd7a438-d127-46f0-bce9-2de31706f516/?utm_term=.f50fb30778ea.

[7] Even in its current briefing, the Commission's description of Ridley's tenure does not get the timing right, as it states that Ridley's "period of service" included the "final months of the thirteen year period during which the 1972 guidelines were principally in force[.]" Def.'s Mem. at 10–11. Ridley never served as a Commissioner under the 1972 Guidelines.

nearly 90% of cases, the Commission set a rehearing date more than one year into the future. No definition of "ordinary" can encompass such a dramatic deviance from the norm. And, for the reasons already discussed, the Commission's primary defense—that it applied the one-year standard on a case-by-case basis and imposed longer set-offs based on offense severity—is simply not supported by record evidence.

Although the court's rejection of Ridley's testimony does not alter its conclusion that the Commission is in breach of the Settlement Agreement, it does require the court to amend an aspect of its Order granting Plaintiffs' Motion to Enforce. Without Ridley's attestations, there is no record proof of the D.C. Board's practices with respect to imposing longer set-offs under the 1972 Guidelines. And, in the absence of such relevant evidence, the court will not speculate as to what the D.C. Board's practices were while those Guidelines were in effect. The court therefore will not limit the Commission's discretion in setting rehearing dates of more than one year to only offenders with recent, verifiable disciplinary problems. Accordingly, the court strikes the following sentence from its earlier Order: "Only Plaintiffs who have had verifiable disciplinary problems since their original hearing are not subject to the presumptive scheduling of a rehearing after one year." Order, ECF No. 100.

The court recognizes that this modification removes any bright-line rule as to when the Commission may deviate from the one-year norm. While bright-line rules usually are preferable, particularly where liberty interests are at stake, the parties did not bargain for such a rule in the Settlement Agreement. The court is in no position to place definite restrictions on the Commission that are not called for by the text of the Settlement Agreement and the New Regulation, and where there is no record evidence to support imposing clear limitations.

3. *The Court's Decision Wastes the Commission's Limited Resources by Requiring* Pro Forma *Annual Rehearings*

Next, Defendant argues that the court's decision was erroneous because it grants *pro forma* annual rehearings for offenders who are not suitable for parole. It asserts that that the court's opinion "misallocat[es] parole decisionmakers' resources away from more parole-suitable prisoners" by mandating that the Commission "go through the motions of needless annual hearings for prisoners for whom parole is not reasonably probable." Def.'s Mem. at 2; *see also id*. at 9–10. In the Commission's view, requiring it to hold annual rehearings for all Plaintiffs is at odds with the Supreme Court's decisions in *Morales* and *Garner*, which caution against holding futile proceedings in the parole context. *Id*. at 9–10; *accord* Def.'s Reply Br., ECF No. 106, at 7–8.

*Morales* and *Garner* do not support reconsideration. Both cases have been on the books for over 15 years, yet Defendant did not cite either when it opposed Plaintiffs' Motion. Nor did the Commission advance the argument that it makes now that the Settlement Agreement should be interpreted to preserve the Commission's resources. For that reason alone, reconsideration is not appropriate. *See Patton Boggs LLP*, 683 F.3d at 403.

But the court disagrees with Defendant on the merits as well. As discussed above, *Morales* and *Garner* both involve Ex Post Facto Clause challenges to retroactive application of law or policy that resulted in a longer time period between parole hearings than the prisoner would have faced under the rules applicable at the time of the offense. In both cases, the Supreme Court found there to be no Ex Post Facto Clause violation. Here, of course, the Ex Post Facto Clause is not at issue. The question presented is governed by contract law principles, not constitutional ones. *See In re Estate of Drake*, 4 A.3d 450, 453 (D.C. 2010) (stating that settlement agreements "are construed under general principles of contract law," and that they are enforced "just like any other contract" (internal quotation marks omitted)); *see also Makins v. District of Columbia*, 277 F.3d

28

544, 546 (D.C. Cir. 2002) ("Settlement agreements are in the nature of contracts."). Thus, *Morales* and *Garner*'s focus on conserving resources in the Ex Post Facto Clause context has little bearing on the instant dispute.

Defendant tries to avoid this obvious disconnect by arguing that the Settlement Agreement "does not permit the plaintiffs to sidestep case law interpreting the parole regulations, nor may they seek to impose requirements at variance with the *ex post facto* and due process principles that undergird many decisions addressing prisoners' challenges on parole matters." Def.'s Mem. at 4 n.1; *see also* April Hr'g Tr. at 5–6 ("[T]he Commission obviously intended to act in conformity with all the jurisprudence governing ex post facto challenges to parole determinations."). In doing so, the Commission seems to suggest that it sought only to do the bare minimum required by the Constitution when conducting parole proceedings for Plaintiffs.

If that was the parties' intention it is not at all apparent on the face of either the Settlement Agreement or the New Regulation. Under the District of Columbia's "objective" law of contracts, "a party's unexpressed intent is irrelevant if a contract is unambiguous." *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (internal citation omitted). In this case, the Commission agreed that it would act in "good faith" to apply the New Regulation as written; nothing on the face of the Settlement Agreement or the New Regulation suggests, let alone states, that the parties thought themselves limited by existing Ex Post Facto Clause jurisprudence. If anything, the circumstances support the opposite conclusion. When it promulgated the final New Regulation, the Commission observed that, because of the broad discretion conferred by the 2000 Guidelines, "federal courts have declined to find that [the] Commission's use of its revised guidelines violates the *Ex Post Facto* Clause." 80 Fed. Reg. at 63,115. The Commission nevertheless decided to apply the 1972 Regulations to offenders who committed crimes before March 3, 1985, but had not yet been

granted parole. *Id.*; Settlement Agreement.  The Commission later reaffirmed that position in this case, when its General Counsel represented that although in *Sellmon v. Reilly*, 551 F. Supp. 2d 66, Judge Huvelle determined that "not all retroactive application of changed rules implicates the *Ex Post Facto* Clause for all prisoners," the Commission decided to apply the 1972 Guidelines for "administrative convenience and consistency."  Krapels Decl. ¶ 4. (citing *Sellmon*, 551 F. Supp. 2d 66).  These statements demonstrate that the Commission, by agreeing to apply the law in effect at the time of Plaintiffs' offenses, viewed itself as going beyond the strictures of the Ex Post Facto Clause.  It is bewildering that the Commission now says otherwise.

### 4.    *Staying a Decision Pending Appeal of Related Matters*

Finally, if the court does not grant its motion in full, the Commission asks to delay any action on this case until the D.C. Circuit decides two pending cases—*Ray v. Smoot*, No. 16-5135 (D.C. Cir. docketed May 31, 2016), and *Ford v. Massarone*, No. 16-5298 (D.C. Cir. argued Apr. 26, 2018).  According to Defendant, both pending appeals present issues substantially similar to this one.  Because "the Circuit may well further opine on the scope of the Commission's discretion concerning parole rehearing set-offs for D.C. Code offenders," Defendant asks the court to hold off on deciding this motion until the Circuit rules in those cases.  Def.'s Mem. at 17–18.

The court declines the Commission's invitation.  There is no good reason to wait.  The court ruled against the Commission on Plaintiffs' Motion to Enforce months ago, and Defendant's present motion has only prolonged this litigation.  Meanwhile, offenders who "ordinarily" are supposed to receive hearings on an annual basis wait for a final order enforcing the parties' agreement.  Any further delay is simply not warranted.  The court therefore will not delay this matter pending the D.C. Circuit's decisions in *Ford* and *Ray*.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion to Alter or Amend Judgment in Part, ECF No. 102, is denied in part and granted in part.  As explained in this Memorandum Opinion, the court reaffirms its decision that the Commission breached the Settlement Agreement by not scheduling the vast majority of offenders for rehearings within one year.  The court, however, amends that portion of its Order that constrains the Commission's discretion to exceed the "ordinary" one-year set-off only in cases of recent, verifiable disciplinary problems.  The court will enter an Amended Order on Plaintiffs' Motion to Enforce that is consistent with this Memorandum Opinion.

Dated: June 11, 2018

Amit P. Mehta
United States District Judge